PHILIP PETERSON v. JEWEL TEA COMPANY, INC.
AND ANOTHER.[1]

June 3, 1949.

No. 34,878.

[1]Reported in 38 N. W. (2d) 51.

*Herbert H. Willcox,* for appellant.
*Meagher, Geer & Markham,* for respondents.

LORING, CHIEF JUSTICE.

Plaintiff below appeals from a judgment entered for defendants notwithstanding a verdict for $900.

In endeavoring to avoid a collision with the truck of defendant Jewel Tea Company, plaintiff's truck, driven by one Arthur W. Paulson, loaded with six tons of lime, struck a telephone pole, which caused the truck to overturn. Plaintiff brought suit to recover for damage to his truck. He alleged that defendant Clara Hoskins, a saleslady driving a light truck for the Jewel company, entered the highway from a gas-station service road going in the same direction as plaintiff's truck, negligently drove the truck into the highway in the path of plaintiff's truck without yielding the right of way, and then made a sudden left turn, causing plaintiff to collide with a telephone pole in an effort to avoid a collision with defendant's truck. The separate answers of the Jewel company and its driver, Clara Hoskins, denied defendants' negligence and pleaded contributory negligence.

Two trials were had. The first trial resulted in a verdict for plaintiff for $900. The court ordered a new trial. In the second trial, defendants moved for a directed verdict at the close of the evidence, which was denied. The second jury also returned a verdict of $900 for plaintiff. Defendants made a motion for judgment notwithstanding the verdict, but no motion for a new trial. The court granted defendants' motion, set aside the verdict, and ordered judgment for defendants, which was entered. Plaintiff has appealed. The sole question presented for decision is whether the evidence was sufficient to sustain the verdict.

Since we must take the facts and the justifiable inferences therefrom most favorable to plaintiff on this appeal, we so state them.

The events leading up to the accident are set forth here in considerable detail, with an accompanying plat of the area.[2] Plaintiff's 1½-ton truck, driven by Arthur W. Paulson, was northbound on highway No. 10 into Anoka, Minnesota. The truck, equipped with overload springs and tires, was loaded with six tons of lime, which, as part of plaintiff's business, was being hauled to different farms near Anoka.

Referring to the plat, highway No. 10 enters Anoka from the south. As it approaches the intersection with Washington street, there is a curve to the right, on the east side of which is a gasoline station. The driveway or service road to and from the filling station parallels No. 10 for at least 230 feet along the east side of the highway. The intersection of No. 10 with Washington street east is 80 to 85 feet north of the north driveway entrance to the filling station. The intersection center of Washington street east and highway No. 10 is 50 feet south of the intersection center of Washington street west and highway No. 10. At the northwest corner of the intersection with Washington street west stands the telephone pole with which plaintiff's truck collided. This pole was 1½ feet from the west curb of highway No. 10.

Highway No. 10 at this point is marked off into three lanes, each approximately nine feet wide. It is a through highway, with stop signs at all public intersections along the route. On the west side of the highway is a four-foot shoulder on which it is possible to drive.

The morning of September 12, 1944, plaintiff's driver, Paulson, was coming around the curve near the filling station, as indicated on the south portion of the plat. He saw defendant's truck about the time his own truck reached the south driveway entrance to the station. Defendant's truck was then in the filling station area and proceeding northwest toward the north entrance to the highway. Plaintiff's truck was at this time in the right-hand lane, traveling at about 25 to 30 miles per hour.

Paulson testified that Mrs. Hoskins did not stop at the highway (point 3 on the plat), but proceeded into it from the driveway at

## [2]PLAINTIFF'S EXHIBIT A.

from 10 to 15 miles per hour. The first time Mrs. Hoskins saw plaintiff's truck was just before she entered the highway. There is evidence tending to prove that Mrs. Hoskins proceeded into the highway, driving partly into the second or middle lane and straddling the marker stripe between the two lanes.

Plaintiff's truck was from 80 to 100 feet behind defendant's truck as it entered the highway. With a six-ton load, it would have taken Paulson from 100 to 125 feet to stop. He asserted that he had no choice but to pass defendant's truck, since he could not slow down in time to avoid a collision. Accordingly, Paulson then started to pass Mrs. Hoskins on the left, traveling in about the middle lane and blowing his horn all the time. She did not yield him space to pass her in the middle lane. As the trucks reached the intersection with Washington street east, plaintiff's truck was to the rear and slightly to the left of defendant's vehicle. The horn was still being blown. The positions of the vehicles are indicated by points 4 and 5 respectively on the plat. There was no southbound traffic. As they approached the intersection with Washington street west, plaintiff's truck was about even with defendant's truck and in the left-hand lane (points 6 and 7), since Mrs. Hoskins had not moved over in response to Paulson's horn signals.

Instead of moving over to permit plaintiff's truck to pass, Mrs. Hoskins, without signaling, turned suddenly to the left in order to start a left turn into Washington street west. At this time, she was occupying the left-hand part of the middle lane of the highway (points P and H) and had crowded Paulson over into the west lane.

Paulson had been forced to move over into the third lane as he started to pass defendant's truck. When Mrs. Hoskins started to turn at the intersection, Paulson moved to the left, out of the third lane onto the extension of the shoulder to avoid contact with defendant's vehicle. He was forced to travel across the intersection at the extreme west edge of highway No. 10, and consequently he collided with the telephone pole. Thereafter the truck sheared off the pole, careened to the right, and overturned. Paulson was not in-

jured, but the truck was heavily damaged, and the lime was spilled along the highway.

■ On appeal from a judgment entered notwithstanding the verdict, this court must take the view of the evidence most favorable to appellant, since the verdict must be accepted as final by both the trial court and the supreme court if it has reasonable support in the evidence. Cf. Johnson v. Johnston, 226 Minn. 388, 33 N. W. (2d) 53; Kundiger v. Metropolitan L. Ins. Co. 218 Minn. 273, 15 N. W. (2d) 487; Eklund v. Kapetas, 216 Minn. 79, 11 N. W. (2d) 805; Mardorf v. Duluth-Superior Transit Co. 194 Minn. 537, 261 N. W. 177; see, 3 Dunnell, Dig. & Supp. § 5082. Credible evidence favorable to appellant must be accepted as true and given the benefit of all reasonable inferences. Cf. Olson v. Byam, 176 Minn. 619, 224 N. W. 256.

■ In order to pass Mrs. Hoskins and to avoid a rear-end collision, it was necessary for Paulson to increase the speed of his truck from 25 to 40 miles an hour as he approached the intersection. Since the emergency was created when Mrs. Hoskins came out of the driveway onto the highway without yielding the right of way to Paulson (M. S. A. 169.20, subd. 4[3]), his attempts to avoid a rear-end collision were foreseeable and justifiable notwithstanding the highway act. § 169.14, subd. 3. This requires the driver of a vehicle to appropriately reduce speed when approaching and crossing an intersection and when special hazards exist. These same facts would have justified the jury in regarding as rebutted any prima facie evidence of contributory negligence caused by any violations of the highway act in swinging into the left lane or failing to reduce speed. Section 169.96 declares that violations of the provisions of the chapter are only prima facie evidence of negligence. The jury could have and did find a reasonable explanation for the violations. Schnore v. Baldwin, 217 Minn. 394, 14 N. W. (2d) 447;

---

[3]"The driver of a vehicle entering or crossing a highway from a private road or driveway shall yield the right of way to all vehicles approaching on such highway."

Yien Tsiang v. Minneapolis St. Ry. Co. 213 Minn. 21, 4 N. W. (2d) 630; cf. Landeen v. DeJung, 219 Minn. 287, 17 N. W. (2d) 648.

■ The remaining question is whether the jury was justified in regarding the negligence of Clara Hoskins as the proximate cause of plaintiff's harm. We take the view that the question of proximate cause was for the jury and that the court could not properly set aside the verdict for plaintiff. Cf. Sanders v. Gilbertson, 224 Minn. 546, 29 N. W. (2d) 357; Medved v. Doolittle, 220 Minn. 352, 19 N. W. (2d) 788; Nees v. Minneapolis St. Ry. Co. 218 Minn. 532, 16 N. W. (2d) 758.

In Elvidge v. Stronge & Warner Co. 148 Minn. 185, 189, 181 N. W. 346, 348, plaintiff, a motorcycle operator, had attempted to pass defendant's truck on the left-hand side of the street while passing through an intersection. Defendant turned suddenly to the left without a signal. The court affirmed an order denying defendant's motion for judgment notwithstanding the verdict, and said:

"The court was not asked to charge any more specifically on this subject. The charge was, in effect, an instruction that plaintiff was negligent in traveling to the left of the center, and a submission of the question of whether this helped to cause the accident. Defendants could not ask more.

"The jury must have found that this conduct of plaintiff did not help to cause the accident. On the evidence, they might so find. They might have found that defendants, by traveling in the center of the street, compelled plaintiff to travel to the left of the center. If so, defendants cannot complain of his doing so. They might also have found that the position of the vehicles as they traveled up Dayton avenue was in no sense the cause of this accident."

Here, also, the jury could find that Mrs. Hoskins' turn into plaintiff's truck without warning was the proximate cause of the accident. The fact that Paulson's speed may have been in excess of that permitted by the statute the jury could regard as not related to his subsequent collision with the telephone pole. That these are questions for the jury, cf. Mahowald v. Beckrich, 212 Minn. 78, 2 N.

W. (2d) 569; Eichten v. Central Minnesota Coop. Power Assn. 224 Minn. 180, 28 N. W. (2d) 862; Kordiak v. Holmgren, 225 Minn. 134, 30 N. W. (2d) 16. The jury could justifiably find that plaintiff's driver, when confronted with the likelihood of a collision, was justified in deciding to pass defendant's truck and in speeding up at the intersection in order to avoid a rear-end collision precipitated by Mrs. Hoskins' entering the highway in violation of the rule requiring her to yield the right of way to vehicles within the zone of immediate hazard. This action on her part, and her further act in initiating a left turn without signaling, justified the conclusion that her negligence was the proximate cause of the collision.

For these reasons, it was error to grant judgment notwithstanding the verdict. The judgment is reversed with directions to reinstate the verdict for plaintiff and enter judgment thereon.

So ordered.

MAGNEY, JUSTICE (dissenting).

Paulson, plaintiff's driver, operating plaintiff's truck in the right lane of a three-lane highway, was 100 to 125 feet south of the filling station driveway when he saw Mrs. Hoskins enter the highway from that driveway without stopping, as he claims. He was traveling at a speed of 25 to 30 miles an hour. After Mrs. Hoskins entered the highway her speed was 10 to 15 miles an hour. As she came onto the highway, she edged over into the middle lane and proceeded along that lane. She was intending to turn left at the intersection 150 feet from the driveway. M. S. A. 169.18, subd. 3(9)(b), provides:

"Upon a roadway which is not a one-way roadway and which is divided into three lanes, a vehicle shall not be driven in the center lane except when overtaking and passing another vehicle * * * *or in preparation for a left turn* * * *;" (Italics supplied.)

Thus, Mrs. Hoskins was driving in her own proper lane. She continued at the speed of 10 to 15 miles an hour toward the intersection. As Paulson got closer to Mrs. Hoskins, he drove into the middle lane also, stating, "I was attempting to pass her." The distance from the point where Mrs. Hoskins entered the highway and

the south line of Washington street which is west of the highway is about 150 feet. Thus, when Mrs. Hoskins entered the highway Paulson was 250 to 275 feet south of the intersection. For about 120 feet south of the intersection the highway is practically straight. As Paulson was driving twice as fast as Mrs. Hoskins, or faster, he caught up with her. When the front end of Paulson's truck was about even with the rear end of Mrs. Hoskins' car, Paulson's truck was about 50 feet from the corner. Mrs. Hoskins was then entirely in the middle lane, and Paulson was edging over into the left lane. The vehicles were alongside of each other 20 feet south of the intersection. Their fronts were in line. Mrs. Hoskins was then in the center lane and Paulson in the third or left lane. Up to this point, there is no evidence that Mrs. Hoskins was crowding Paulson, as she was driving in her proper lane. From the time Paulson's truck was 50 feet from the intersection until the cars were alongside of each other, Paulson had driven 30 feet and Mrs. Hoskins about 15. Up to that point, 20 feet from the intersection, Mrs. Hoskins had driven 130 feet on the highway and Paulson had driven 230 to 255 feet from where he was when he saw her enter the highway. Thus, when the vehicles were 20 feet from the intersection, they were alongside of each other—one going 25 to 30 miles an hour and the other 10 to 15 miles. So while Mrs. Hoskins was traveling the 20 feet to the intersection, Paulson was traveling at least 40 feet. Of course, speed and distances are mere estimates, and these are Paulson's estimates. So when Mrs. Hoskins reached the south line of the intersection, Paulson's whole truck must have been about over that line. That must have been the case, since the vehicles were traveling only two feet apart, and they did not come in contact. On Paulson's own testimony, it would have been impossible for Mrs. Hoskins to turn in front of his truck at the south line of the intersection. Paulson was asked:

"Q.   Where did she start to turn?

"A.   Right on the corner.

*     *     *     *     *

"Q. Did she continue to go perfectly straight ahead from the point 50 feet south of the corner until she got right up to the corner?

"A. Yes.

"Q. She went perfectly straight then?

"A. Yes."

Paulson did not start turning until she made the so-called sudden turn. His whole car must have been in the intersection at that time.

At the time Paulson saw Mrs. Hoskins come out from the driveway, he intended to overtake and pass her to the left. So he says. He was then 250 to 275 feet from the intersection. It continued to be his intention to overtake and pass her. It was never his intention in approaching the intersection and seeing Mrs. Hoskins ahead of him to slow down. Nor did he attempt to do so. He kept blowing his horn continuously, another indication that he was intending to pass her and not to slow down. About 20 feet from the corner he speeded up to 30 miles an hour, or better. Mrs. Hoskins was still going 10 to 15 miles an hour. He was asked:

"Q. In attempting to pass her and passing her you were going well over 30 miles an hour, were you not?

"A. I wouldn't say I was going well over 30.

\* \* \* \* \*

"A. After I knew I had to pass her I probably stepped on it. I don't know. I know I wasn't going well over 30.

\* \* \* \* \*

"Q. Well, some over 30 in your judgment?

"A. Possibly."

The facts which have been recited are taken from the testimony of Paulson himself, the driver of plaintiff's truck. These facts show that he violated several statutes. Section 169.14, subd. 3, reads in part:

"The driver of any vehicle shall, consistent with the requirements, drive at an appropriate reduced speed when approaching and crossing an intersection * * *."

Paulson violated this statute, according to his own testimony. He put on more speed as he approached this intersection, with the intention of crossing at the increased speed, before he knew whether Mrs. Hoskins was going to stop or turn. He said he was then possibly going over 30 miles an hour, faster than the maximum permissible speed.

Section 169.18, subd. 3, reads in part:

"The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions, and special rules hereinafter stated:

\* \* \* \* \*

"(9)   When any roadway has been divided into three or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply:

\* \* \* \* \*

"(b) * * * (The left lane of a three-lane roadway, which is not a one-way roadway, shall not be used for overtaking and passing another vehicle.) ;"

On the undisputed facts and his own testimony, Paulson was driving in the left lane of a three-lane roadway in overtaking and passing Mrs. Hoskins. He was driving in a forbidden zone.

Section 169.18, subd. 3(6), reads in part:

"Except on a one-way roadway, no vehicle shall, in overtaking and passing another vehicle or at any other time, be driven to the left half of the roadway under the following conditions:

\* \* \* \* \*

"(b)   * * * when approaching within 100 feet of or traversing any intersection * * *;"

On his own testimony, Paulson violated this provision of the statutes.

Thus, Paulson drove his truck in a prohibited lane. Instead of slowing up at the intersection he speeded up to possibly more than 30 miles an hour. He overtook and passed the Hoskins car to the left when approaching within 100 feet of an intersection and traversing the same.

Paulson's explanation and claimed justification for passing the Hoskins' car as he did was that he "had to." He said it was never his intention to slow down behind Mrs. Hoskins' car and wait until he got beyond the corner to pass it, because he "couldn't." Why did he "have to" pass as he did, and why "couldn't" he slow down? He was asked:

"Q. Why? Were you going too fast?

"A. Well, you couldn't stop a six-ton load very fast.

"Q. You knew you couldn't stop that truck very fast at that time, didn't you?

"A. Well, certainly."

He said he could not slow up enough to pull in behind the Hoskins car and wait until he got beyond the corner to pass. He said he had to pass it. He was driving a 1½-ton truck with oversize springs and tires, loaded with 12,000 pounds of lime. He was asked:

"Q. * * * it made it quite a whole lot harder to handle than if you had not had 13,000 [sic] pounds on it?

"A. I imagine it would be, yes.

"Q. It would make it a whole lot harder to stop, take a greater distance to stop the truck?

"A. Yes.

"Q. And it made it harder to turn?

"A. Certainly.

"Q. And your pickup was slower?

"A. Yes.

"Q. It just made it harder to handle all the way around, having that heavy load on it, did it not?

"A. In comparison, yes.

"Q. Yes. Now having 12,000 pounds on the truck and attempting to stop it under the conditions that existed that day, in what distance could you stop your truck * * * assuming that you were going 30 miles an hour on that highway?

"A. I imagine it would take 100, 125 feet maybe."

He claims that he had to pass the Hoskins car. Because of the size of the truck and the load he was carrying, he could not slow up enough or stop, although he had 250 to 275 feet within which to do so before he reached the intersection. He said he knew his car and load situation. The size of the truck and the oversize of the load created a situation which made it impossible for him to have the truck under proper control. He freely admits it. Defective brakes would not have created a more dangerous situation. In addition to being unable to slow down properly or stop within 250 or 275 feet, traveling between 25 and 30 miles an hour, because of the weight of the load and the size of the truck, the truck was difficult to steer. On his own testimony, he was a menace on the highway. Of course, he claims that the driving of Mrs. Hoskins into the highway without signal created an emergency, but there is nothing in his testimony, except his own statement, to indicate that such was the case. Nothing happened as a result of that situation. If an emergency arose at the intersection, as he claims also, that was wholly of his own creation, as has been shown. Paulson drove an overloaded small truck, which could not be stopped within 250 or 275 feet, going 25 to 30 miles an hour, on a heavily traveled state highway within a municipality, and which otherwise could not be properly controlled because of the 12,000-pound load it was carrying. He drove it in a prohibited lane, passing another car when approaching within 100 feet of an intersection and traversing same, and increasing the speed to possibly more than 30 miles an hour when entering the intersection. If such conditions and conduct did not proximately contribute to cause this accident, as a matter of law, then I have misunderstood the doctrine of contributory negligence. For the reasons above set forth, I respectfully dissent.