ARLENE GRANT v. MALKERSON SALES, INC., AND
ANOTHER.
ARLENE GRANT v. CLIFTON GRANT.

116 N. W. (2d) 181.

June 22, 1962—Nos. 38,272, 38,273.

*Danforth & Allen,* for appellant General Motors Corporation.

*Tyrrell, Jardine, Logan & O'Brien* and *Raymond W. Fitch,* for appellant Malkerson Sales, Inc.

*Swenson & Miley* and *Irving Gotlieb,* for respondent Clifton Grant.

*Dorfman & Rudquist,* for respondent Arlene Grant.

THOMAS GALLAGHER, JUSTICE.

Action for personal injuries arising out of an automobile accident. The jury returned a verdict of $30,700 for plaintiff, Arlene Grant, against defendants, Malkerson Sales, Inc., and General Motors Corporation. In the verdict the jury attempted to pro rate the damages against such defendants as follows:

Defendant General Motors 80 percent
Defendant Malkerson Sales 20 percent

It found in favor of defendant Clifton Grant, owner and driver of the car.

Subsequently, Malkerson Sales and General Motors both moved for judgment notwithstanding the verdict or for a new trial. In addition Malkerson Sales moved for judgment of indemnification against General Motors on its cross-claim tried in the proceedings; and General Motors moved for judgment of indemnification against Malkerson Sales or judgment of contribution by Malkerson Sales and Clifton Grant. All of such motions were denied and both Malkerson Sales and General Motors have appealed from the order to such effect.

At the trial it was the claim of plaintiff that the automobile owned and driven by her son Clifton Grant, in which she was a passenger at the time of the accident, had been negligently and dangerously assembled, engineered, designed, and manufactured by General Motors; had been negligently and carelessly serviced, conditioned, and inspected by Malkerson Sales prior to its sale by the latter to Clifton Grant; and that the accident was proximately caused by the described negligent conduct of such defendants.

On appeal Malkerson Sales contends that the evidence is insufficient to support a finding of negligence against it; and that it is entitled to a judgment of indemnity against General Motors. General Motors contends that the evidence is insufficient to sustain a finding of negligence against it and that the damages awarded plaintiff are so excessive as to indicate passion and prejudice on the part of the jury.

The facts relative to the accident are as follows: On May 16, 1957, Clifton Grant purchased the automobile, a 1957 Super 88 Oldsmobile, from Malkerson Sales in Minneapolis. It had been manufactured by Oldsmobile Division of General Motors in Kansas City, Missouri, and delivered to Malkerson Sales, a distributor for Oldsmobile in Minneapolis, on April 9, 1957. Shortly after its delivery a mechanic and employee of Malkerson Sales performed the customary predelivery inspection and maintenance on the automobile required by a written agreement between Malkerson Sales and General Motors. Following its purchase, Clifton Grant drove it in Minneapolis for a few days. He had no complaints about its condition except with reference to its high consumption of gasoline. On May 17, 1957, he brought it in to Malkerson Sales and requested that it be adjusted because of its high consumption of gasoline. He was advised there that adjustments could not be made until later and thereupon left with the car. On Sunday, May 19, 1957, with his mother Arlene Grant as a passenger, he drove the car to Rochester. They returned to Minneapolis about 10:30 p. m. that day.

While driving west on 38th Street at that time, Grant brought the car to a stop for a red light at Chicago Avenue, which intersects 38th Street. He testified that at this stop the car suddenly gave a jerk and proceeded forward at a speed which accelerated as he proceeded west

along 38th Street, sometimes reaching the rate of 90 miles per hour or more; that at the intersection formed by 38th Street and Fourth Avenue he turned north on Fourth Avenue at a high rate of speed; that in turning, his car struck and glanced off a parked car on Fourth Avenue; that after this the car continued going north on Fourth Avenue at a high rate of speed until it finally came to a stop on Fourth Avenue near 23rd Street; that while the car was thus operated both on 38th Street and on Fourth Avenue he repeatedly tried various means of stopping it; that the foot brakes were ineffective; that the emergency brake was ineffective; that the gear shift lever was placed in lower speeds in an effort to slow the car without effect; that the ignition was turned off without effect; that notwithstanding all such measures the car continued on at an excessive and dangerous rate of speed; that before he stopped it, he went through 13 red lights and was required to swerve in and out of traffic to avoid collisions with other vehicles; and that when the car finally stopped smoke was coming from the tires and from under the hood and the radiator was steaming.

Other testimony indicated that after the car came to a stop Arlene Grant stepped out of it without assistance and that firemen and policemen arrived shortly afterwards. One witness, John C. Toomey, a service station operator, testified that he had observed the car going north on Fourth Avenue in front of his station at a high rate of speed and that he had followed it in his car to where it finally came to a stop; that with the aid of a flashlight he had looked under the hood at that time and had observed that the bell crank had moved out and was hanging on the spark plug bracket with the result that the car was held in passing gear with the gas throttle opened wide.

Evidence was submitted to show that the bell crank pivot pin is similar to a bolt without a head, with 8 to 10 threads on one end and a hole drilled through on the other; that the end with the threads screws into the carburetor and projects outward therefrom in a horizontal position; that the bell crank is made with a hole approximately the same size as the bell crank pivot pin and the pin fits into this hole, after which spacer washers are added to provide free movement of the auxiliary bell crank, and a cotter key is inserted in the pin and the ends bent to retain it therein. To the auxiliary bell crank there is as-

sembled a rod extending to the carburetor bell crank and a rod extending to and attached to the front dash mechanism and thence to the accelerator pedal. Another rod attached to the bell crank is mounted on the cylinder head with linkage to the transmission so that there is a definite relationship between the carburetor and the transmission.

With respect to this assembly, Mr. Toomey testified that the cotter key which should have been in the outer end of the bell crank pivot pin was missing; that in consequence the bell crank had moved out and was hanging against the spark plug wire bracket; but that although the pin remained in the carburetor and had not become unfastened the bell crank had slipped down as described.

The car was returned to Malkerson Sales where several employees made an examination of it with respect to the bell crank unit. Those testifying agreed that the cotter key was in proper position on the outer end of the pivot pin; that the bell crank was still on the pivot pin; but stated that the pivot pin had become unscrewed and became lodged behind the spark plug bracket. At that time Malkerson Sales promptly delivered to Grant a new Oldsmobile of the same type and color as the one returned by him.

Testimony was submitted by General Motors, through its field service engineer, with respect to the inspections and tests given to an automobile before it leaves the assembly plant in Kansas City. He testified that, if the cotter key and bell crank pivot pin were properly in place when a car left the factory, they would not come out under normal usage. He also testified that under a standard contract between General Motors and its distributors, including Malkerson Sales, predelivery inspections were to be made by the distributors before delivery of cars to purchasers, and that such inspections would give the inspector a close view of the bell crank assembly in each car inspected.

Mr. Clarence Brose, an employee of Malkerson Sales, testified with respect to inspections and tests given at Malkerson Sales before delivery of cars to its customers. He testified that such inspections required working in the area of the carburetor and also required the removal of the air cleaner above it so that such area would be completely visible to the inspector; that he did not recall the inspection of this par-

ticular car, but that if the bell crank pivot pin was partially unfastened in the carburetor, or had fallen down, such a situation would have been obvious during the predelivery inspection. The service manager of Malkerson Sales testified that no reports had been made of such difficulties in any of the automobiles inspected prior to the time the car was sold to Clifton Grant.

Paul Olson, one of the police officers called to the scene when the car had finally stopped, testified that at that time he asked Arlene Grant if she were hurt and that she had said she was not. Olson testified also that plaintiff's appearance was neat and clean and that she did not appear to be nervous or excited in any way. Further testimony relative to her claims of injury will be discussed with reference to the issue of excessive damages.

■ In another action arising out of this accident, the jury returned a verdict in favor of Clifton Grant against General Motors for $7,250, but absolved Malkerson Sales from liability for negligence. On an appeal by General Motors, we held that the evidence there presented on the issues of negligence and proximate cause was adequate to sustain the jury's finding against General Motors on such issues. Grant v. Malkerson Sales, Inc. 259 Minn. 419, 108 N. W. (2d) 347. Since the evidence in the instant case on these issues is substantially the same as that presented in the prior action, it must follow that here also the finding of the jury that General Motors was negligent, and that its negligence was a proximate cause of the accident, is sustained by the evidence relied upon by plaintiff.

■ The obligation of Malkerson Sales to General Motors in regard to predelivery inspections of Oldsmobile automobiles delivered to it by General Motors is covered by a printed form which lists the tests required before delivery of automobiles to purchasers. Such list includes: "Adjust carburetor idle mixture and idle speed"; "Adjust fast idle to specifications"; "Check throttle linkage for freeness at wide open and closed throttle"; and "Road test for performance and handling." While these inspection requirements imposed upon Malkerson Sales the duty of making a careful and close visual inspection and of testing the parts described above which had been permanently assembled and installed at the factory by General Motors,

it would be unreasonable to hold that it placed upon Malkerson Sales the burden of removing, inspecting, and replacing each of such parts. Its full compliance with the instructions described would not have disclosed the defects in the bell crank assembly which permitted the bell crank of the Grant automobile to slip down and force the spark plug bracket against the passing gear. Accordingly, it follows that there is nothing in the record to lend support to the jury's finding that some negligence on the part of Malkerson Sales constituted a proximate cause of the accident. This being true, it must be concluded that the trial court erred in denying the motion of this defendant for judgment notwithstanding the verdict against it.

■ Examination of the evidence with reference to plaintiff's injuries indicates that the verdict of $30,700 therefor was so excessive as to indicate passion and prejudice on the part of the jury. It clearly discloses that the plaintiff had not suffered any broken bones or serious bruises or contusions in the accident; that after the car came to a stop she had left it without assistance and had then stated that she felt no ill effects; that she had remained in the car's vicinity for some time afterwards; that a police officer and other witnesses had observed that she then appeared well and neat and clean; and that no doctors had been called at that time and no ambulance had been required to move her.

The following morning she went to the office of Dr. Thomas H. Johnson, who thereafter treated her several times at her home and at his office. He found a slight concussion from which she recovered within a few months. One month after the accident he reported that she was "feeling fine." Later, on August 16, 1957, he directed her to go to Mount Sinai Hospital where she remained for 15 days under the care of Dr. Sidney Shapiro. The latter saw her at intervals at his office during 1957 and January 1958. He testified as to an electroencephalogram performed for her which indicated only "a minimum diffuse abnormality"; that three subsequent electroencephalograms indicated that she was normal in every respect; that neurological examinations made by him on November 27, 1957, and on January 16, 1958, disclosed that she was normal; that with respect to certain complaints which she made he found nothing objective, but that there tended to

be "considerable fluctuations in the intensity" and "to some extent I think she will continue to have them."

At the request of Dr. Shapiro, plaintiff was examined by Dr. Joseph A. Resch on January 22, 1960. Based on this examination, Dr. Resch formed the opinion that plaintiff had no abnormalities except as to complaints made by her, and that he could find nothing in the way of "organic causation" for her symptoms.

At the trial plaintiff admitted that she had continued to do her own housework and had cleaned off snow from her sidewalk, but testified that she had not resumed doing domestic work for others. She testified that at times she had trouble with her left eye, but Dr. Johnson testified that her "eyes were normal." She testified that "the back of my neck gets stiff"; that at times she had pain in her back and neck; that at times she had a "heavy feeling" on her chest; and that after she had washed windows her arm was "stiff."

When we consider such testimony and the opinion evidence of plaintiff's medical experts to the effect that there were no objective findings to support her complaints and that there were no broken bones or serious bruises or contusions; and when it is recalled that many of her complaints related to pains or aches which might normally be expected in a person 58 years of age, we are compelled to conclude that the verdict returned is so excessive and exorbitant that it should not be permitted to stand.

Accordingly, as to General Motors Corporation, the order appealed from is affirmed on condition that plaintiff, within 10 days after the filing of this opinion, shall have filed in this court a written consent to reduction of the total verdict to the sum of $15,000; otherwise, such order, insofar as it denies the motion of General Motors Corporation for a new trial, is reversed, and a new trial is granted as to this corporation on the sole issue of damages.

As to Malkerson Sales, Inc., the order appealed from is reversed with directions that judgment notwithstanding the verdict be entered in its favor.