JOSEPH AUGER v. LLOYD V. ROFSHUS AND
ANOTHER.

125 N. W. (2d) 159.

December 6, 1963—No. 38,953.

*Scholle, Schweiger & Kalina,* for appellants.
*Fiori L. Palarine* and *Harry H. Peterson,* for respondent.

OTIS, JUSTICE.

The plaintiff, Joseph Auger, was injured when a tractor-trailer he was operating overturned while passing on the right an automobile which was being driven in the same direction and was slowing to a stop in preparation for a left turn. The jury awarded the plaintiff $26,500. Defendants appeal from an order denying their motion for judgment notwithstanding the verdict or a new trial.

On September 25, 1960, between 4 and 5 p. m., plaintiff was driving a fully loaded gasoline transport, weighing some 83,000 pounds, south on Highway No. 65 from St. Paul Park to Fairmont. About 4 miles north of Albert Lea he approached a secondary highway designated as Lerdal Road when his attention was attracted to a car owned by Barbara Rofshus and driven by Lloyd Rofshus (hereafter referred to as defendant) through the application of defendant's brake lights some 500 feet ahead. Defendant was then 50 to 75 feet north of the intersection. While it appears without dispute that defendant intended to make a left turn, plaintiff testified that defendant failed to signal his intention either manually or by a signal light. It further appears that as plaintiff approached from the north a car owned and operated by one Luella Reid was approaching the intersection from the south, which defendant asserts prevented his completing the turn. Although plaintiff applied his brakes, he testified that when he was within 200 feet of defendant he realized he could not stop and at a point some 100 feet from the intersection he turned onto the shoulder in an attempt to pass defendant on the right. After successfully crossing the apron of Lerdal Road plain-

tiff's vehicle struck a soft area created by new fill, causing him to lose control and to turn over in the ditch. In the course of the upset, a heavy hydraulic jack which was loose in the cab struck plaintiff in the back.

In their assignments of error defendants assert (1) that even if Lloyd Rofshus failed to signal for a left turn his negligence was not a proximate cause of the accident, (2) that plaintiff was guilty of contributory negligence as a matter of law, (3) that it was reversible error not to permit certain impeached testimony of defendant to be rehabilitated, and (4) that the damages were excessive.

■ With respect to the issue of proximate cause, defendant argues that failure to make a left-turn signal[1] could not have caused the accident because plaintiff had seen Miss Reid's northbound car approaching in the lane he would have to use if he passed defendant on the left, and hence plaintiff was not led into a hazardous position which a warning signal would have prevented. Defendant reasons that even if he had given a left-turn signal, at the speed plaintiff was traveling he would have been required to pass on the right or collide with the rear of defendant's vehicle. While there is much force to this argument, it overlooks the fact that the jury could find plaintiff did not see defendant's brake light until defendant was 50 to 75 feet from the intersection, and that plaintiff was thus denied the full warning contemplated by the statute requiring signals to be given for at least 100 feet before turning. Clearly it was the court's duty to charge the jury with respect to the necessity for defendant's giving the statutory signal, leaving to their determination the question of whether the violation was a proximate cause of the accident. It is significant that no exception to such instructions was taken by the defendant.

Apart from the question of an adequate signal, there is evidence from which the jury could otherwise find defendant negligent. While a driver intending to make a left turn has the duty of stopping next to the centerline and yielding the right-of-way to any oncoming vehicles which constitute an immediate hazard,[2] he also has an obligation to

---

[1] Minn. St. 169.19, subd. 5.

[2] § 169.20, subd. 2; Gustafson v. Schilt, 263 Minn. 294, 297, 116 N. W. (2d) 557, 559.

maintain a proper lookout for vehicles approaching from behind[3] and to give whatever signal may be necessary to prevent a rear-end collision.[4] The evidence permitted the jury to find that Miss Reid pulled over to the shoulder and stopped her vehicle before she reached the intersection, and that defendant had an opportunity to make a left turn before the transport bore down on him. It was for the jury to decide whether defendant properly observed the traffic to his rear, adequately signaled his intended movement, and acted prudently in failing to clear the intersection in time to permit plaintiff to pass safely through.[5]

■ The issue of whether or not plaintiff was guilty of contributory negligence presents a much closer question. Plaintiff testified that he first saw defendant's brake light when the vehicles were 500 feet apart and that the signal indicated to him defendant's intention either to stop or to take some other action. Plaintiff was then driving 45 miles an hour, and defendant was 50 to 75 feet north of the center of the intersection. Plaintiff stated that as he applied his brakes he noticed the Reid car coming from the opposite direction, and added:

"The brakes wasn't holding. The brakes and everything were on, but the momentum was too great. I was still moving closer and getting closer, was going to run into the rear of him."

Plaintiff then passed defendant on the right, which defendants assert was a violation of Minn. St. 169.18, subd. 4. We believe the jury could find that plaintiff's maneuver was sanctioned under that part of the statute which authorizes passing on the right if the vehicle overtaken is about to make a left turn.[6]

---

[3]Martinco v. Hastings, 265 Minn. 490, 499, 122 N. W. (2d) 631, 639.

[4]Kuether v. Locke, 261 Minn. 41, 49, 110 N. W. (2d) 539, 545.

[5]We are not persuaded by the argument that the soft fill constituted an intervening cause, insulating defendant's negligence. See, Peterson v. Jewel Tea Co. Inc. 228 Minn. 521, 528, 38 N. W. (2d) 51, 56; Smith v. Carlson, 209 Minn. 268, 273, 296 N. W. 132, 135; Annotation, 39 A. L. R. (2d) 15, 37, and 55; 4 Blashfield, Cyc. of Auto. Law and Practice (Part 2, Perm. ed.) § 2599.

[6]§ 169.18, subd. 4(a).

There was expert testimony that plaintiff could have brought his vehicle to a stop with 300 or 400 feet after he applied his brakes. While the evidence is strong that plaintiff did not have his transport under proper control and as jurors we would very likely have found him negligent, in view of the emergency which confronted him and the uncertainty of defendant's intentions, we are unable to say as a matter of law that plaintiff failed to exercise the care required of him under the circumstances.

At the trial defendant testified he did not see the plaintiff until plaintiff was within 100 feet of the intersection. On cross-examination he was confronted with a deposition in which he stated he had seen plaintiff's truck pass another vehicle approximately a quarter of a mile to the rear. Without attempting to reconcile the inconsistencies, defendant stated that the answers he gave in the deposition were not true. On redirect examination defendant's counsel was permitted to read part of the deposition in which defendant indicated he derived his information from what his passenger had told him. Before he had completed reading other portions of the deposition in an effort to rehabilitate defendant, his counsel was stopped by the court on an objection that the evidence was irrelevant. This is assigned as error.

It is a general rule that a witness may always explain the circumstances under which differing statements have been made, and he is not necessarily impeached by inconsistent testimony given from the stand. Courts should be liberal in affording witnesses an opportunity to reconcile versions which are at variance.[7] In the instant case, however, the nature and purpose of the statement which counsel was prevented from reading do not appear in the record. There was no offer of proof which permits us to pass on the relevancy of the proposed evidence. Under such circumstances we hold that no prejudicial error has been shown.

The defendants attack the verdict as excessive. The evidence permitted the jury to find that at the time of the trial plaintiff was 35

---

[7]Kellett v. Wasnie, 261 Minn. 440, 446, 112 N. W. (2d) 820, 824; 3 Wigmore, Evidence (3 ed.) § 1044; Henslin v. Wingen, 203 Minn. 166, 169, 280 N. W. 281, 282.

years of age with a life expectancy of 31.78 years. He was employed at two separate jobs, working 60 hours a week and earning $150 a week. It appears that plaintiff was out of work from September 25, 1960, until February 5, 1961, and that upon returning to work he was able to hold only one position, paying $75 a week. However, he had other special damages of only $180 for medical services, and $443 for hospital care from October 27 to November 12, 1960. He received no treatment from his attending physician from January 16, 1961, to May 1962.

Plaintiff was conscious and ambulatory at the scene of the accident, was taken to the hospital and released after half an hour, and returned to remain at the scene until about 8 o'clock that evening. Upon arriving back in St. Paul Park, he drove his own car to his home. His attending physician saw him next day and again on September 27, but he was not hospitalized until a month later. It was the testimony of the plaintiff that following the accident he had a sore leg and knee and a cut on his right arm. His ribs and back were bruised when struck by the jack, and his foot was twisted by the clutch pedal. The following day his leg was swollen and his hips and back were stiff and sore. He received heat treatments and medication for pain and wore a chest harness. By way of treatment he also received rubdowns, hot packs, and vibrating therapy. He continues to wear a brace. Although he had previously been active in athletics, he has been obliged to forego strenuous exercise. At the time of trial he continued to complain of pain and pressure in his back and was no longer able to do heavy work requiring lifting, twisting, and stretching.

Plaintiff's attending physician testified that on first examining plaintiff he found abrasions on his chest and right shin, his right knee twisted and swollen, and his ankle sprained. Plaintiff complained of pain in the lumbar region, where the doctor confirmed the fact that plaintiff's muscles were spastic. X-rays taken were all negative. The doctor was of the opinion that plaintiff experienced considerable pain and attempted to relieve the condition by use of traction. On the doctor's advice plaintiff was examined by two neurologists and two

orthopedists, none of whom testified.[8] By way of prognosis the attending doctor stated:

"A. Well, this man has had quite a severe injury, and he has got—he may and he may not respond to treatment. It has been very difficult for him to do it up to now I think he will be disabled to some degree as far as the use of his back is concerned, in lifting and twisting his back while working as long as these tender areas remain in his back.

"Q. Do you have an opinion as to whether or not this condition is of a permanent nature?

"A. I don't know. I think he has a partial permanent disability.

"Q. To what extent?

"A. But this area of numbness on the side of his leg is the area that is supplied by the second and third lumbar nerves from the lumbar plexus, and his sensitiveness of the spine apparently at this time is in that area. Now, whether that is involving this nerve from this plexus which lies outside of the spinal column and is imbedded in the muscle has anything to do with this numbness of the leg, I don't know, but it has come on since the time of the accident.

"Q. Now, you say that there is a permanent partial disability. To what extent would it be?

\*    \*    \*    \*    \*

"A. He would class around, probably around 20 per cent disability.

\*    \*    \*    \*    \*

"Q. Twenty per cent permanent partial disability—

---

[8]The hospital notes of one orthopedist state:

"\* \* \* Back difficulty now has resolved itself mainly to soreness in muscles. Most of complaints referable to g. u. tract.

"Exam:

"In no acute distress. Moves about w. ease. No list or muscle spasm. Subjectively tender to pressure in the erector spinal muscles in lumbar area. Motion in spine is normal. The neurolog. & str. leg raising tests were normal. No areas of hyposthenia. No muscle atrophy or weakness. Peripheral vascular pulsations OK.

"X-rays all reviewed & found neg. I can find no objective evidence of serious back injury. Would recommend only continued conservative Rx. Might try a back support."

"A.   Partial.

"Q.   —of the back?

"A.   Yes."

On cross-examination the doctor stated that the 20-percent back disability may or may not improve.

In arriving at the amount of plaintiff's damages, his counsel used as a formula to justify the amount of the verdict 20 percent of the difference between plaintiff's annual earnings before and after the accident, multiplied by his life expectancy. In our opinion, such a computation is not justified by the evidence. Plaintiff himself testified that he did not intend to work 60 hours a week indefinitely, and the jury was not warranted in assuming otherwise. Based on the time plaintiff was actually out of work, his wage loss was approximately $2,800. His other special damages amounted to only $623.90.

We have held in a number of situations that where the period of disability is limited and the symptoms are primarily subjective, we will not hesitate to scrutinize the verdict to determine whether the jury has kept within permissible bounds of reason and commonsense. While ours is never an easy task, and it is one which in good practice should more properly have been assumed by the trial court, we feel obliged to take appropriate action in those cases where the amount of the award "shocks the court's sense of justice," and the impropriety of allowing the verdict to stand is so manifest as to show a clear abuse of discretion.[9]

Under the circumstances we are of the opinion the jury's verdict is excessive. Consequently a new trial will be granted unless within 10 days plaintiff files in writing his consent to a remittitur reducing the amount of the verdict to $16,500.

ROGOSHESKE, JUSTICE (dissenting).

Although I unhesitatingly agree that the award is excessive as a mat-

---

[9]McCormick v. Malecha, 266 Minn. 33, 43, 122 N. W. (2d) 446, 453. See, also, Lesewski v. Nielsen, 254 Minn. 286, 289, 95 N. W. (2d) 13, 16; Grant v. Malkerson Sales, Inc. 263 Minn. 107, 113, 116 N. W. (2d) 181, 185.

ter of law, I am reluctant to join in ordering a remittitur even though a new trial on the issue of damages appears unwarranted.

I start with the premise that, short of granting a new trial, this court (as the majority opinion succinctly expresses) ought not to perform the trial court's responsibility and reduce jury awards except in most unusual cases. I cannot classify this case as unusual in the sense that the trial judge passed upon the necessity of a remittitur and was directly confronted with determining the amount to be ordered. Although defendant argued excessiveness below and may have urged a reduction of the award, in the absence of a memorandum we can only infer that the award was held not to be excessive and, therefore, the propriety of a remittitur never arose. We have now held the award excessive as a matter of law. It seems to me that going beyond this and ordering a remittitur can only be justified upon the ground of expediency or perhaps because there are no recognized procedures for remanding the case to enable the trial judge to discharge a responsibility which, for a host of reasons, rests primarily upon him.

Our not infrequent use of appellate remittitur tends, I believe, to invite abdication of this responsibility. The most experienced trial lawyers and judges concede that translating personal injuries into money damages is a most difficult problem. When an award is challenged and the trial judge is confronted with the problem, the difficulties and the weight of the burden increase. He must perform it aided by few well-defined rules and frequently without the aid of counsel. Unless specifically directed, counsel avoid suggesting the amount of a remittitur lest their posttrial positions be weakened, or because they refuse to face realities or simply do not know what figures to suggest. Moreover, other incidents occurring during trial can complicate the problem, and diluting the sweetness of victory by reducing the verdict is often fraught with unpleasant and distressing consequences. One cannot easily criticize the participants at the trial level if they dispose of the problem by postponing it for action by this court, even though they may join in denouncing an appellate tribunal for functioning as a "superjury."

In a case where our conclusion that the award is excessive directly conflicts with the trial judge's decision, and where it appears that a re-

mittitur would be proper, I believe a modified procedure could be fashioned which would be more consonant with fairness to the parties and, indeed, to the trial judge. In reviewing a claimed excessive award, the judge must first determine if it is excessive as a matter of law before he can properly address himself to whether or not a remittitur should be used to avoid the time and expense of a retrial. Although there is overlapping in the actual performance of these functions, experience suggests that separating the questions is the better practice. If an award is on the borderline between liberal and excessive, there is a natural tendency to characterize the award as liberal and uphold it rather than to declare it excessive and face the problems of choosing whether to grant a new trial on all issues, a new trial limited to damages, or a remittitur. In this case the record does not reveal that the trial judge squarely faced the task of determining the amount of a remittitur. Further, nothing in the record suggests that, upon being confronted with our unanimous holding that the award is excessive, he would suffer any offense or feel any reluctance to reexamine the testimony and perform a duty not previously discharged.

I would remand to the trial court with directions to accord the parties a hearing and thereupon to reduce the award in such amount as the trial judge deems justified by the evidence, subject to further review at the option of any aggrieved party. This would afford an opportunity for the trial judge to obtain the benefit of counsel's conflicting views focused upon the single issue of the amount of the remittitur; and his decision, together with an accompanying memorandum, would be of inestimable aid to further review by his court, if such were in fact necessary. Furthermore, it would permit the trial judge to evaluate the arguments of the parties in the light of his observations of the conduct, appearance, and demeanor of the injured party at trial. No experienced trial lawyer or judge can successfully challenge the fact that inherent in every award or settlement of a personal injury suit is the appearance and demeanor of the injured party.

There are, of course, obvious criticisms of this suggested procedure. Among others, the trial judge may feel justifiably offended at being directed to reduce an award which he previously decided, after full

hearing, should not be reduced. It must be observed that this could readily be avoided if the trial judge would accompany every posttrial order with an explanatory memorandum, for such is an essential aid to proper communication between trial and appellate courts. Inevitably, many cases would be returned for further review, thus adding delay and expense. Surely, however, simplified rules for such review could be adopted to alleviate this disadvantage. The task of formulating such rules cannot be an excuse for refusing to return a primary responsibility for discharging a judicial function to the court in the best position to perform it.