# LUCILLE M. KROEGER v. HJALMER JACOB LEE AND ANOTHER.

132 N. W. (2d) 727.

January 8, 1965—Nos. 39,219, 39,342.

*Ryan, Kain, Mangan, Westphal & Kressel* and *Edward C. Hoff-man,* for appellant cooperative.

*Rosengren, Rufer, Blatti, Hefte & Pemberton* and *Richard L. Pemberton,* for appellant Lee.

*Olson, Kief & Severson* and *Robert K. Severson,* for respondent.

SHERAN, JUSTICE.

The appeal of the Cooperative Oil Association of Blackduck, Minnesota, (hereinafter called the cooperative) from an order of the District Court of Anoka County denying its alternative motion for judgment notwithstanding the verdict or for a new trial, and the appeal of Hjalmer Jacob Lee, codefendant with the cooperative, from the judgment of the district court entered following denial of his motion for a new trial, have been consolidated and present the issues for consideration by this court.

Action was instituted by Lucille M. Kroeger against Lee and the cooperative for personal injuries sustained when a vehicle—owned by Luverne E. Kroeger but admittedly operated by him as the agent of the cooperative—in which the plaintiff was riding as a passenger, was hit from the rear by a vehicle operated by Lee in the city of Anoka, Minnesota, at about 5:30 p. m. on February 6, 1961.

On the day of the accident, Luverne Kroeger, accompanied by plaintiff, his wife, was proceeding from Blackduck to Minneapolis. Near Becker, Minnesota, they came upon a disabled vehicle and undertook to transport the occupants of it—one of whom was evidently quite ill—to the Northern Pacific Hospital in St. Paul, Minnesota. At Elk River they were assured that an effort would be made to secure a police escort from Anoka. Driving easterly on Main Street in that city and approaching the intersection with Fifth Avenue, which runs north and south, they observed a police car coming from the opposite direction. Thinking it to be the anticipated escort vehicle, Luverne Kroeger turned right on Fifth Avenue and came to a stop facing south, near the westerly curb and just south of the crosswalk.

Lee also approached the place of the accident from the east on Main Street. He also observed the police car and his attention was therefore distracted from the traffic ahead of him as he turned to the right. As a consequence he was so close to the Kroeger car when he saw it stopped that, although he was traveling slowly and the two southbound lanes of Fifth Avenue were each 12 feet wide, he was unable to avoid the collision by turning. His attempt to apply the brakes was probably ineffectual.

At the instant of collision, Mrs. Kroeger, sitting in the front on the passenger side of her husband's car, was turned sideways observing the condition of the rear-seat occupants. She was jarred so that her head snapped to one side and then to the other. Although upset emotionally, she felt no physical distress until that night when she had "a terrific headache." The following morning her neck was stiff and painful. The Kroegers remained in Minneapolis from Monday evening until the following Friday. Mr. Kroeger attended a convention there. The record gives no account of Mrs. Kroeger's activities during these 4 days. She "kept taking anacins" and "figured it was something that would pass over." After returning to Blackduck, she consulted a Northome physician, Dr. Franklin, who prescribed heat treatments administered over a period of about 10 days. In May she consulted Dr. Lawrence R. Russ, a chiropractor in Bemidji, who treated her on about 60 occasions, giving electrical heat treatments which afforded only temporary relief. In September 1961 she was referred to Dr. Kenneth W. Covey, an orthopedic physician practicing in Crookston, but 24 visits to his office and intensive care during a one-week period of hospitalization in April 1962 have not relieved the pain, disability, and emotional disturbance claimed to have resulted from the accident.

The consolidated appeals raise these issues:

(1) Does the evidence justify a jury finding that the negligence of both drivers concurred proximately to cause the accident?

(2) Did the trial court err in refusing to grant this instruction requested by the cooperative:

"If you find that, as Mr. Lee approached Mr. Kroeger's car, that car was in Mr. Lee's plain sight and in a position of obvious peril for a sufficient length of time to enable Mr. Lee in the exercise of reasonable care to avoid a collision with it, then you can find that his failure to avoid the collision is an efficient, intervening cause of the accident which breaks the natural sequence and progression of the negligence, if any, of Mr. Kroeger as a proximate cause?"

(3) Was the verdict in favor of the plaintiff in the amount of $20,000 so excessive in light of the evidence as to compel a new trial or remittitur?

Defendant cooperative is critical of a part of the closing argument of plaintiff's attorney but no exception was made with respect to it prior to the time the jury retired for its deliberations.

1. The jury's verdict imposing liability on both defendants is justified by the evidence. The place where Mr. Kroeger stopped was marked as a no-parking area and was near an outlet of a busy intersection. It was "dusk" at the time. The effect of stopping there was not only to obstruct traffic moving from Main Street southerly onto Fifth Avenue but also to create a block in the road which a motorist, turning to the right as he moved through the intersection, might fail to see promptly if, as here, his attention was distracted by traffic within the intersection. To us it seems that the collision which occurred is exactly what Mr. Kroeger should have anticipated. Whether his anxiety to gain the attention of the police officer stopped in the intersection at the time justified this conduct was a jury question. Krafft v. Hirt, 260 Minn. 296, 110 N. W. (2d) 14, upon which defendant cooperative relies, involves a factual situation so different from that here presented as to make it wholly inapplicable.

Lee's negligence in rear ending the car ahead of him was at least a jury question. See, Souden v. Johnson, 267 Minn. 151, 125 N. W. (2d) 742.

2. The trial court did not err in refusing the proposed instruction with respect to superseding or intervening cause. For a cause to be superseding, the following elements must be present: (1) Its harmful effects must have occurred after the original negligence; (2) it must not have been brought about by the original negligence; (3) it must actively work to bring about a result which would not otherwise have followed from the original negligence; and (4) it must not have been reasonably foreseeable by the original wrongdoer. See, Minnesota Jury Instruction Guides, Instruction 142, and authorities cited. The collision which occurred was foreseeable by Kroeger as a matter of law. This is so whether his car was stopped within a foot of the curb, as he contended, or 6 or 7 feet from the curb, as Lee testified. It is also true whether Kroeger was stopped only momentarily before the impact, as Lee claimed, or for a period long enough in time to enable

Kroeger to get out of the car and close the door, as he recalled the fact to be. In either event his car formed an obstruction to traffic southbound on Fifth Avenue which Lee did not see until avoidance was impossible, and this because, as was reasonably to be foreseen, his attention was diverted to the intersection. In Strobel v. Chicago, R. I. & P. R. Co. 255 Minn. 201, 96 N. W. (2d) 195, the foreseeability, from the standpoint of an employer who directed his employee to work on a ladder erected on a bridge used for vehicular traffic, of the negligence of a driver in running into the ladder was considered to be a question for the jury. The court there said (255 Minn. 209, 96 N. W. [2d] 202):

"* * * Although it was reasonably foreseeable that Heilman and other motorists would be driving over the bridge in the lane in which plaintiff had placed the ladder, we cannot hold as a matter of law that it was reasonably foreseeable that Heilman, who entered upon the bridge in low gear at a speed of about 8 miles per hour, and who admittedly killed his motor after driving 50 to 70 feet on the bridge, would drive an additional 200 or more feet (or a total bridge distance of 275 feet) without seeing directly in front of him plaintiff on a ladder in a position of peril without taking steps to avoid the collision."

The difference between that case and this one comes from the facts that here Lee was driving easterly until he turned to the right just before the impact and that his attention was distracted from the obstruction by the police car. The accident which resulted was precisely of the kind that the specific prohibition against stopping at the outlet of the intersection was designed to avert. In our judgment this collision was foreseeable as a matter of law.

3. We cannot agree that the record supports a verdict in the amount of $20,000 for the personal injuries sustained.

The accident impact, although described as "solid" and "forceful," was between a stopped vehicle and one going no more than 10 m.p.h. It was not severe enough to throw plaintiff against the dashboard, windshield, or any other hard surface in the interior. Repairs to the plaintiff's car cost only $258. Damage to the Lee vehicle was limited to some broken glass in the front right headlight.

Plaintiff had no specific physical complaints at the accident scene. She received no medical attention during the 4 days between the time of the accident and her return to Blackduck. Dr. Franklin of Northome, whose knowledge of her condition after the accident would have been most helpful in evaluating the injuries, was not called as a witness. His deposition was not taken by the plaintiff, and the record does not show that defendants were offered a waiver of privilege and timely opportunity to take his deposition before trial. Except for the distance separating Anoka from Northome, his absence is without explanation. Under the circumstances, the strictures against "ignoring doctors who are in the best position to evaluate an injury" appearing in Gordon v. Land of Lakes Motor Co. 262 Minn. 97, 99, 113 N. W. (2d) 576, 577, become relevant. Although Dr. Franklin did not see the plaintiff until 17 days after the accident occurred, he did treat her over a period of almost 2 weeks. In evaluating the relationship between the accident and the present, largely subjective complaints of the plaintiff, the absence of his testimony is of particular significance since she was not again seen by a physician until September 14, 1961—over 7 months after the accident. This is so even though chiropractic treatments were initiated on May 24, 1961.

On the other hand the testimony of the plaintiff herself, corroborated to a limited degree by her husband, is persuasive of the fact that Mrs. Kroeger, having the care of five children ranging in age from 2 to 15 years, has experienced considerable discomfort, pain, and inconvenience. Before the accident she was a healthy young woman living on a farm and able to perform her household tasks without assistance. So far as the record shows, she had no prior occasion to claim or receive compensation for personal injury or disability although the record does imply that she was overweight and of a nervous temperament. In the period of about 2 years elapsing between the time of the accident and the time of the trial, she has submitted regularly to medical and chiropractic treatments, traveling from her home to Crookston and Bemidji for this purpose. Hospitalization for intensive treatment, first recommended by Dr. Covey in December 1961, was accomplished in April 1962 when she spent about one week in the hospital at Crookston

where traction with weights up to 25 pounds was used in an effort to give relief from pain. The discharge notation appearing in the hospital record reads:

"Diagnosis—Neck Sprain. Condition on discharge—Recovered."

Notwithstanding this, Mrs. Kroeger continued to have difficulty until the time of trial. At night she had been using a traction device to which a 5-pound weight was attached in order to extend the cervical area. She has continued to use medically prescribed drugs in an effort to relieve pain and emotional tension. She has difficulty with such routine household tasks as ironing or hanging up clothes. She finds the care of her children to be more exhausting emotionally than it was before the accident. Her complaints at trial included periodic headaches in the occipital area; pain in the cervical area with sporadic radiation to the upper extremities; occasional numbness in the hands and fingers; emotional tension; sleeplessness; and irritability.

Although the judgment of the jury as to the nature and extent of the injuries must have been based in a considerable measure upon the testimony of plaintiff herself, there is believable expert testimony with respect to limitation of motion in the cervical area; loss of grip in the right hand; observable muscle spasm in the cervical area; and absence of radial pulse with arms raised above a right angle.

Dr. Covey examined Mrs. Kroeger in 1961 on September 14 and December 15; and in 1962 he examined her on January 4, February 24, April 2, April 19, June 7, July 13, September 27, and, finally, on November 8.

Upon the examination of September 14, 1961, he noted that she was "tender over the mid-portion of her neck"; movement of the neck was limited as compared to a normal range of motion; and he noted that "elevating her arms above the level of her shoulders obliterated or shut off the pulse in her hands." He attributed this loss of pulse to a "sagging of the shoulders due to weakness of the neck muscles" attributable to the accident. Reflexes were normal in her upper extremities. Her grip measured about 30 pounds in the right hand and 60 pounds in the left, from which Dr. Covey concluded that, being right-handed, she was weak in that extremity. The X rays taken were nega-

tive and he concluded on the basis of his initial examination that she had sustained a sprain of her neck on account of the accident.

The examination conducted on December 15, 1961, was essentially the same as that of September 14.

Mrs. Kroeger's condition appeared to be somewhat improved on January 4 and February 24, 1962, but when, on April 2 of that year, she continued to complain of weakness in her arms, the doctor considered that she was not responding the way she should to home treatment and placed her in the hospital in Crookston for the one-week period to which reference has been made previously. As of April 19, 1962, Dr. Covey noted that Mrs. Kroeger's weight which had been 162 pounds in September of 1961 and 160 pounds in January of 1962 had dropped to 144 pounds. He thought that this weight loss "could have been due to nervous tension and headaches and nausea and that her appetite wasn't as good as it should be." He also considered it possible that the loss of weight was attributable to the use of dexanyl, a drug which he had prescribed and which he then discontinued.

Mrs. Kroeger was hospitalized for pneumonia from May 23 to May 27, 1962, but no claim is made that this condition was attributable to the accident. However, there were complaints of soreness in the right shoulder and her left arm was more painful "because of the coughing she had done with the pneumonia." As of June 7, her weight was 132 pounds.

As of July 13, 1962, Dr. Covey, noticing the persistence of her symptoms, concluded that—

"* * * she had this neck sprain with a weakness of her neck muscles and shoulder muscles and that she was having trouble with the circulation in her arms as a result; and I thought that she should try to exercise her arms to try to strengthen these muscles."

At the time of his last examination on November 8, 1962, Mrs. Kroeger told him:

"* * * [H]er head was too heavy for her neck and she was dizzy and had headaches and she was tired. She had aching in her arms when driving a car and working. She had been taking the darvon, the

pain medicine, once a day and she had also been taking librium, the tranquilizer, each day."

It is on the issue of permanence that the recorded evidence leaves us much in doubt. The admitted life expectancy of plaintiff was 40.75 years. Although a period of approximately two years elapsed between the time of the accident and the time of the trial, and although the complaints of the plaintiff with respect to pain, discomfort, and emotional tension made during this interval were reasonably consistent, the permanent residual of the accident-caused injury is ambiguous. X rays taken by Dr. Lawrence R. Russ, the Bemidji chiropractor, and Dr. Kenneth W. Covey, the Crookston orthopedist, were essentially negative. Although Dr. Russ did note that one of the X rays taken by him in May 1962 and one taken in October of 1962 showed "loss of that normal forward curve in the neck," there is nothing in the testimony of Dr. Covey on this phase of the matter. Dr. Covey found nothing abnormal in the X rays he took and noted that the foramen and nerve outlets in the cervical area were normal. The expert evidence on the question of permanence was vague. It was the chiropractor's conclusion that plaintiff suffered from persistent and continued nervousness and apprehension and, based largely on her subjective complaints, he expressed the opinion that she would continue to experience pain and limitation of motion permanently. He did not attempt to assess the extent of her disability in terms of function and concluded by stating with respect to her nervousness:

"* * * That would be more in the realm of the medical profession. All I can comment on there is that she has continued nervousness and apprehension and continued weight loss which seems to tie in with emotional causes."

Dr. Covey, examined on the question of permanence, testified:

"Q. Doctor, the last time you examined her, can you tell us just what conclusions you came to as to what she was suffering from and what, if any, permanent injury she had as a result of the accident on February 6, 1961?

"A. Well, I felt that she had sustained a neck sprain and that she

had residual loss of motion in her neck which has been more or less constant the last year, and I felt that she did have a permanent disability as far as her neck was concerned.

"Q. Doctor, so far as this here loss of a pulse is concerned and this trouble that she's having with her hands, in your opinion is that a permanent condition?

"A. Over this length of time, I think it is. Ordinarily I would hope or think it would possibly go away, but it hasn't over this period of time.

"Q. Now, Doctor, the nervous condition for which you have been giving her the librium, in your opinion is that a permanent thing?

"A. I don't know.

"Q. Well, Doctor, is there anything medically that you know of that can be done for her to relieve somewhat from the various symptoms that she has been complaining to you about and for which you have been treating her?

"A. I don't know of anything else besides what we have done, the heat and massage and pain medication when she needs it and the tranquilizers when she's nervous and muscle relaxant for the muscle spasm and the exercises, at least trying to exercise the shoulder.

\*   \*   \*   \*   \*

"Q. Well, Doctor, can you tell us with reasonable medical certainty as to whether or not these treatments that she has been taking from Dr. Russ, the physiotherapy treatments are something that she's going to have to take for the rest of her life based upon her permanent condition?

"A. I'm not sure that she would.

"Q. Well, can you tell us just what is going to take place with reasonable medical certainty so far as her body is concerned or what the doctors can do for her to relieve her of these symptoms of which she complained to you about and for which you treated her?

"A. She's going to have to continue to have treatments along the lines that I have previously mentioned, the heat and massage and perhaps manipulations from time to time to relieve her pain, yes."

In light of the pertinent decisions of this court on the subject,[1] we have come to the conclusion that a verdict in the amount of $20,000 which does not include special damages in any amount is not sustained by the evidence disclosed by the record. The alternatives are to remand the case to the district court for a new trial on the issue of damages only or to affirm conditionally. We have agreed that a verdict in excess of $15,000 could not be justified on the record before us.

Therefore, the judgment and order of the trial court from which the appeals were taken are affirmed upon condition that plaintiff files with this court within 10 days from the filing of this decision her consent that the verdict as returned by the jury be reduced to $15,000. If such consent is not filed during that period of time, the judgment will be vacated and the case will be remanded to the district court for a new trial as against both defendants on the issue of damages only. Taxation of costs will abide the determination of plaintiff on the question of remittitur. If the remittitur is filed, the judgment and order will stand as affirmed and costs will be taxable by respondent. If remittitur is refused, the effect will be a reversal of the judgment and order and costs will be taxable by the appellants to the extent permitted by our rules.

Affirmed conditionally.

ROGOSHESKE, JUSTICE (dissenting).

I agree that the verdict is excessive but I do not agree that we should determine the amount of the remittitur. Since the award in this case is peculiarly dependent upon the credibility of the injured party, I would remand to enable the trial judge, after hearing, to reduce the award, subject to further review at the option of any party, as proposed by the dissenting opinion in Auger v. Rofshus, 267 Minn. 87, 125 N. W. (2d) 159.

---

[1]Lesewski v. Nielsen, 254 Minn. 286, 292, 95 N. W. (2d) 13, 18; Gordon v. Land of Lakes Motor Co. 262 Minn. 97, 99, 113 N. W. (2d) 576, 577; Tanski v. Jackson, 269 Minn. 304, 311, 130 N. W. (2d) 492, 497; Grant v. Malkerson Sales, Inc. 263 Minn. 107, 113, 116 N. W. (2d) 181, 185; Auger v. Rofshus, 267 Minn. 87, 125 N. W. (2d) 159; Romano v. Dibbs, 256 Minn. 332, 336, 98 N. W. (2d) 146, 149.