Duane LORSHBOUGH, et al.,
Respondents,

v.

TOWNSHIP OF BUZZLE, et
al., Defendants.

COUNTY OF BELTRAMI, et al.,
defendants and third-party
plaintiffs, Appellants,

v.

Carson BERGLUND, et al.,
third-party defendants.

No. 46686.

Supreme Court of Minnesota.

Aug. 19, 1977.

Powell, Drahos & Baer, Romaine R. Powell and Carl C. Drahos, Cann, Schmidt & Weddel, Bemidji, for appellants.

Grose, Von Holtum, Von Holtum, Sieben & Schmidt, Harry Sieben, Jr. and David A. Stofferahn, Minneapolis, Jack Fena, Hibbing, for respondents.

Donald A. Kannas, Sp. Asst. Atty. Gen., St. Paul, for third-party defendants.

KELLY, Justice.

This is an action charging the Township of Buzzle and its officers, and the County of Beltrami and its commissioners with negligent maintenance of the township dump. Their maintenance allegedly precipitated a fire ·in the dump that subsequently spread to and damaged plaintiffs' property. Defendant county and its commissioners appeal pursuant to Rule 103.03(i), Rules of Civil Appellate Procedure, from an order of the district court denying their motions for summary judgment.

On May 4, 1973, a fire of unknown origin began to burn in the Buzzle Township dump, near the Village of Pinewood in Beltrami County. It was contained within the dump that day and on May 5 covered with earth by a bulldozer. The fire continued to smolder, however, and it was monitored by the Department of Natural Resources, and a local man placed at the department's disposal. Additional garbage was dumped at the site even though cracks developed in the earth covering. On May 15, a gust of wind swept burning straw from under the earth covering to garbage on top, which ignited and sparked nearby weeds and timber. A forest fire ensued, destroying various real and personal property belonging to plaintiffs who lived nearby.

The trial court found that the only negligence by the county concerned its compliance with Minn. St. c. 400 and regulations promulgated by the Pollution Control Agency (PCA) with respect to solid waste disposal. The County Solid Waste Management Act of 1971 requires counties to enforce solid waste regulations within their jurisdictions. Minn. St. 400.06.[1] Beltrami County took some steps in this regard. John Kemp, the county highway engineer, was appointed solid waste officer. His assistant, Wesley Djonne, inspected the dumps in Beltrami County in late August and early September 1971 in preparation for drawing up a preliminary solid waste management plan in accordance with Minn. Reg. SW 11(3).[2] The inspection revealed

---

1. Minn. St. 400.06 requires: "All counties shall provide for the periodic inspection of solid waste collection, storage, transportation and disposal facilities located and being operated within their respective boundaries to determine whether such facilities are being maintained and operated in compliance with applicable county ordinances and rules, regulations, standards, orders, permits, and requirements of the agency. In the event that such facilities are not so in compliance, the county board shall take such actions as are necessary to assure future compliance with all applicable ordinances, rules, regulations, standards and re- quirements, according to law, and shall cooperate with the agency in obtaining and maintaining such compliance."

2. Minn. Reg. SW 11(3) provides: "On or before July 1, 1971 each county shall submit to the Agency a workable preliminary plan for a solid waste management system within such county. On or before July 1, 1972 each county shall submit for the approval of the Agency a workable final plan for a solid waste management system within such county. The plan shall be amended from time to time as changing conditions occur, by filing revisions for the approval

that many of the approximately thirty dumps in the county were not in compliance with PCA requirements; indeed, Djonne found only one dump operating with a PCA permit. He noted that the Buzzle dump presented a "Potential Fire Hazard (Pine Trees)." However, no burning of garbage apparently had occurred at the Buzzle dump, though it had at others. The record is unclear regarding the actions thereafter taken by the county, but it is evident the county did not take immediate steps to enforce the PCA regulations.

Defendants argue that instead of concentrating on closing the nonconforming dumps, the county attempted to provide a necessary alternative landfill for garbage destined for the closed dumps. In any event, the county negotiated a stipulated agreement with the PCA, dated May 14, 1973, extending the deadline for a final solid waste management plan from July 1, 1972, until January 1, 1974. At the time of the fire in May 1973, the Buzzle dump had no PCA permit nor does it appear to have then met other PCA regulations. The dump was closed 6 weeks after the fire, apparently at the request of the county solid waste officer and PCA official.

Plaintiffs commenced this action to recover damages for losses caused by the fire. Each of the defendants moved for summary judgment. The court granted the motion of the township and its officers on the basis of governmental immunity, but denied the

other motions. It did, however, certify as important and doubtful the question whether defendant county and its commissioners owed plaintiffs a duty under Minn. St. c. 400 and the PCA regulations, thus permitting this appeal.

■■■ Plaintiffs' negligence action relies on statutes and regulations to provide defendants' duty of care. An unexcused violation of a statute that establishes a standard of care is negligence, and liability is the consequence if proximate causation is proved. See, *Dart v. Pure Oil Co.*, 223 Minn. 526, 532, 27 N.W.2d 555, 558 (1947). Part of the determination that the statute supplies a standard of care involves an analysis whether the plaintiff belongs to the class of persons the legislature intended to protect by enacting the statute. Restatement, Torts 2d, § 286; see, *Akers v. Chicago, St. P., M. & O. Ry. Co.*, 58 Minn. 540, 544, 60 N.W. 669, 670 (1894). That is the sole issue certified to this court on appeal and asserted as the issue by plaintiffs.[3] Only the issue certified is properly before the court. *Pierce v. Foley Bros. Inc.*, 283 Minn. 360, 368, 168 N.W.2d 346, 351 (1969).

Defendants look to *Hoffert v. Owatonna Inn Towne Motel, Inc.*, 293 Minn. 220, 199 N.W.2d 158 (1972), for the law generally applicable to this situation. In *Hoffert*, the plaintiffs were guests at a motel that had been recently remodeled. The owners of the motel had submitted their proposal for

of the Agency. Such plans and revisions shall be adopted by the Board of Commissioners of the county prior to filing with the Agency.

"Each county shall provide for a solid waste management system plan to serve all persons within the county. Two or more counties may elect to submit a joint plan."

3. Defendants state this issue in part as follows: "Does the County of Beltrami and its officers by virtue of enactment of MSA 400.06 and Minnesota Pollution Control Agency Regulations SW 6, SW 10 and SW 11 owe a duty of the plaintiffs herein?"

Both parties have included extraneous matter in their briefs and argument. Defendants, for example, suggest that the performance of any duty imposed on them involves the exercise of discretion. Although the discretionary nature of a local governmental duty is a defense to a negligence action, Minn. St. 466.03, subd. 6, the

question of discretion is immaterial to the issue whether the duty runs to plaintiffs and their damages. Similarly, because of the procedural posture of the case, we cannot adjudge definitively the factual controversies presented, e. g., the foreseeability of each plaintiff's injuries. Defendants concede for purposes of this appeal that the statute and regulations imposed a duty on the county and its commissioners but assert that duty did not run to these plaintiffs as individuals.

Plaintiffs have attempted to raise another issue by claiming Beltrami County was negligent per se because of its violation of Minn. St. 400.06 and Minn. Reg. SW 6, 10, and 11. The trial court did not certify this question as important and doubtful for immediate appeal to this court. For this reason, we decline to rule on it.

improvements to the City of Owatonna. The city engineer and building inspector then examined the motel and issued a building permit. The building inspector also examined the premises during construction. Two weeks after his last inspection, a fire broke out in the motel and the plaintiffs alleged they were trapped on the second floor because of improper stairway enclosures constructed in violation of the building code. In affirming the dismissal of the complaint and third-party complaint against the city, we stated:

"* * * In order to recover against the city, appellants must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public." 293 Minn. 222, 199 N.W.2d 160.

The purpose of the building code was to protect the public and it was "not meant to be an insurance policy by which the municipality guarantees that each building is built in compliance with the building codes and zoning codes." 293 Minn. 223, 199 N.W.2d 160. Since the building code ordinances did not create a duty owed plaintiffs as individuals, they could not recover for the alleged negligence of the city's employees. The public duty doctrine, as advanced in *Hoffert*, is also the law of other jurisdictions. E. g., *Modlin v. Miami Beach*, 201 So.2d 70 (Fla. 1967); *Duran v. City of Tucson*, 20 Ariz.App. 22, 509 P.2d 1059 (1973); *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969); Restatement, Torts 2d, § 288(b) (no liability attaches if the statute exclusively "secure[s] to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public"). See, also, Annotation, 46 A.L.R.3d 1084.

The district court in attempting to distinguish *Hoffert* pointed to the "rather unbelievable" conduct of the county's solid waste officer and his assistant. From the inspection, they learned that the Buzzle dump did not comply with PCA regulations, and indeed was a potential fire hazard, but they did nothing to secure compliance or close the dump. The court could legitimately have found that the county officers had actual knowledge of the danger to plaintiffs property that was created by the township dump.

Courts have recognized situations in which a plaintiff has distinguished himself from other members of the public and thus prevented application of the public duty doctrine. Such cases usually involve some sort of contact between the governmental unit and the plaintiff which usually induces detrimental reliance by the individual.[4] There was no evidence of any communication between plaintiffs and the county regarding the dangerous condition of the dump. Hence, plaintiffs must rely only on the statute and regulations to establish a duty owed them in their individual capacity.

Plaintiffs' position, however, is not without support. Defendants had actual knowledge of a dangerous condition, a fact not present in *Hoffert*[5] and a fact making certain cases which find such a duty more relevant. One such case is *Corridon v. City of Bayonne*, 129 N.J.Super. 393, 324 A.2d 42 (1974), in which an off-duty, intoxicated police officer shot and killed a man with his service revolver while conversing with him in a bar. Police regulations required that the officer always carry his service revolver. There was evidence that the city knew

4. See, e. g., *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958)(protection for police informer); *Smullen v. City of New York*, 28 N.Y.2d 66, 320 N.Y. S.2d 19, 268 N.E.2d 763 (1971) (plaintiff entered trench that subsequently collapsed in reliance on city sewer inspector's statement that it needed no further shoring). See, also, *McCorkell v. City of Northfield*, 266 Minn. 267, 123 N.W.2d 367 (1963)(no custodian on duty at jail where prisoner died of asphyxiation due to smoldering fire). Other courts have recognized

the possibility of a special relationship, but did not find it in the case before them. E. g., *City of Tampa v. Davis*, 226 So.2d 450, 454 (Fla. Dist.Ct.App. 1969): "[A] municipality is liable in tort * * * only when such tort is committed against *one with whom the agent or employee is in privity, or with whom he is dealing or is otherwise in contact in a direct transaction or confrontation.*"

5. *Hansen v. City of St. Paul*, 298 Minn. 205, 208, note 2, 214 N.W.2d 346, 349 (1974).

or might reasonably have known of the officer's bouts of intoxication in public places during his 6 years of service with the department. The court found that a duty might be found on these facts:

" * * * It is clear that the hazard of firearms is so extraordinarily great that a municipality has a plain duty of care in its supervision of those whom it arms. * * * The duty is one to abate such an extraordinary risk if in related circumstances danger to others is reasonably to be perceived." 129 N.J.Super. 397, 324 A.2d 44.

Another such case is *Campbell v. City of Bellevue*, 85 Wash.2d 1, 530 P.2d 234 (1975). There, the plaintiff's neighbor electrically lighted a creek that ran through his property. A dead raccoon was found one day in the creek. Its electrocution was reported to the city's electrical inspector who examined the outdoor wiring and found that it did not meet electrical code requirements. He left a red tag advising: "Wiring running thru creek is unsafe and constitutes a threat to life. This situation will have to be corrected immediately or the service will be disconnected." The city inspector telephoned the next day and was assured that the outdoor wiring would be disconnected until properly installed and inspected. He then assured another neighbor of the plaintiff that the problem had been corrected. The caretaker of the property in question turned off the relevant circuit breaker switches and put tape over them. The switches were not turned on again except for brief periods when he used his electric garage door. Almost 5 months after the

raccoon was found, while the garage door was in use, plaintiff's 6-year-old son fell into the creek and received a paralyzing shock. Called to rescue him, his mother too suffered a shock and fell into the water. The son was revived, but his mother died. The court found that city ordinances required the city electrical inspector to immediately disconnect the hazardous wiring. His breach of this duty resulted in the city's liability to plaintiff:

"In the instant case, the City's electrical inspector was alerted to and knew of the nonconforming underwater lighting system and of the extreme danger created thereby to neighboring residents in proximity to the stream in question. Yet, the inspector failed to comply with the City's ordinances * * * directing that he sever or disconnect the lighting system until it was brought into compliance with electrical code requirements. *These requirements were not only designed for the protection of the general public but more particularly for the benefit of those persons or class of persons residing within the ambit of the danger involved, a category into which the plaintiff and his neighbors readily fall.*

"Accordingly, we find municipal liability." 85 Wash.2d 13, 530 P.2d 241 (Italics supplied.)[6]

Even more pertinent is *Adams v. State*, 555 P.2d 235 (Alas. 1976), in which the plaintiffs sued the State of Alaska for injuries arising from a hotel fire in Anchorage. The state admitted its negligent failure to abate known fire hazards in the hotel, discovered by state inspectors 8 months before

**6.** Similarly in *Griffin v. United States*, 500 F.2d 1059, 1069 (3 Cir. 1974), the court predicated a governmental duty to the plaintiff, who was injured from ingesting polio vaccine, on a Federal statute and regulations, observing: "We are unable to state that the findings of fact of the district court as to negligence are erroneous. The Government, however, contends that as a matter of law neither the statute, 42 U.S.C. § 262(d), nor the regulation promulgated thereunder, create a duty owed to individual members of the public. Citing the Restatement (Second) of Torts § 288(b), the Government argues that the statutory language concerning the 'safety, purity, and potency' of biological products contemplates at most a duty 'vis a vis manufacturers' and the general public, but not running to individual consumers. We are aware of no legislative history, however, to support this narrow construction of the duty imposed by the statute. Even assuming that Congress intended to provide for the public welfare, only if its intention was *exclusively* for the public welfare does § 288(b) of the Restatement apply. We are unable to conclude that Congress did not intend, at least in part, that the protections of § 262(d) and regulations extend to individuals as well as the public at large."

the fire. The hazards, which were an inoperative fire-alarm system and construction in progress on the hotel's third floor, presented an "extreme life hazard," in the words of an assistant state fire marshal shortly after the inspection, but the state failed to proceed further than promising the hotel's manager a letter detailing the fire code violations. The court did not reach the question whether certain statutes requiring enforcement action imposed a duty on the state, instead it held that the state had assumed a duty under the common law by its affirmative conduct,[7] which it breached through inaction. The duty ran to the plaintiffs, who were users of the hotel and "the intended beneficiaries of the inspection services provided and the foreseeable victims of the fire hazards left uncorrected." 555 P.2d 241. The court found the public duty doctrine inapplicable for two reasons:

"First, the common law duty which we discuss * * * is not one owed to the general public, nor is it expressly based upon the mandates of the fire inspection statutes. The duty is a limited one, and its beneficiaries a limited class. In undertaking to inspect and advise on the conditions in the Gold Rush, the state undertook a duty to those injured by the burning of the hotel, not to the public in general.

"Second, we consider that the 'duty to all, duty to no-one' doctrine is in reality a

form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine. An application of the public duty doctrine here would result in finding no duty owed the plaintiffs or their decedents by the state, because, although they were foreseeable victims and a private defendant would have owed such a duty, no 'special relationship' between the parties existed. Why should the establishment of duty become more difficult when the state is the defendant? Where there is no immunity, the state is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not." 555 P.2d 241.[8]

Yet, contrary results have been reached on qualitatively similar facts. In *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969), a county deputy sheriff was on duty parked in a tavern parking lot near a highway. Two men emerged from the tavern and, driving separate cars, left the parking lot in a reckless manner at a high rate of speed and proceeded side by side down the highway, a heavily traveled, curving mountain road. The deputy sheriff followed but made no effort to apprehend them. A head-on collision resulted in 5 deaths and disabling injuries. The court, affirming dismissal of the complaint for failure to state a legally cognizable claim, stated:

7. The conduct consisted of undertaking to inspect the hotel and discovering life-threatening fire hazards there. But the court also held that once a fire inspection has been undertaken, the state has a duty to discover fire hazards that would be uncovered by an inspection conducted with ordinary care. 555 P.2d 240.

8. The Wisconsin court recently rejected the public duty doctrine in favor of the traditional concept of duty as determined by foreseeability: "The 'public duty'—'special duty' distinction * * * set[s] up just the type of artificial distinction between 'proprietary' and 'governmental' functions which this court sought to dispose of in *Holytz* [v. *Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618 (1962)(abrogating governmental immunity)]. Any duty owed to the public generally is a duty owed to individual members of the public." *Coffey v. City of Milwau-*

kee, 74 Wis.2d 526, 540, 247 N.W.2d 132, 139 (1976).

In *Coffey*, a building inspector negligently inspected water pipes designed to provide water to fight fires in an office building. Defects in the pipes thwarted the fire department from preventing the plaintiff's fire loss. The court affirmed an order overruling a demurrer to the complaint, and stated: " * * * A building inspector must be held to have foreseen that his alleged negligence in performing the required inspection might have foreseeably resulted in harm to someone. Furthermore, under the rule of law stated in Restatement, 2 *Torts* 2d, p. 142, sec. 324A, * * * the building inspector, once he did undertake to inspect the building had a duty to exercise reasonable care in so doing. That duty flowed to the plaintiffs herein." 74 Wis.2d 539, 247 N.W.2d 139.

" * * * [T]here are situations where a government, or agency thereof, can by its conduct, narrow an obligation owing to the general public into a special duty to an individual, for the breach of which it is responsive in damages.

\* \* \* \* \* \*

"What the plaintiffs urge here is a doctrine that the obligations of public officers are duties [owed] personally to each and every individual member of the public. The extent of potential liability to which such a doctrine could lead is staggering. \* \* \*

"The duty of the defendants here is patently one owed to the general public, not to the individual plaintiffs, and no facts are pleaded which would bring this case into the realm of the exceptions to the rule." 104 Ariz. 523, 456 P.2d 381.

■ It may be possible to distinguish the recent cases finding a governmental duty owing to individual plaintiffs, but such distinctions are too fine to persuade us to reject the principle derived from those cases. The principle is that a governmental unit owes a particular individual a duty of care when its officer or agent, in a position and with authority to act, has or should have had knowledge of a condition that violates safety standards prescribed by statute or regulation, and that presents a risk of serious harm to the individual or his property. When such serious injury is reasonably foreseeable, the governmental unit has a duty to exercise reasonable care for the individual's safety.

■ We need not embrace the principle in full to decide the instant case. The county officers had actual knowledge of a condition that seriously endangered plaintiffs' property.[9] Moreover, the condition existed on property maintained by the government in providing a service to the public. In both respects, the present circumstances impose a greater responsibility on the government than did the situation in *Hoffert.* We hold that defendants could have owed plaintiffs individually a duty of care where they had actual knowledge of a condition that violated PCA regulations, threatened a risk of serious harm to plaintiffs, and arose from property maintained by the government as a dumping site for the public.

■ Our holding does not conflict with the twin policy bases of the public duty doctrine. First, it is unlikely to subject governmental units to staggering liability. Similar considerations were advanced in favor of sovereign immunity but did not convince us to perpetuate the doctrine. *Spanel v. Mounds View School Dist. No. 621,* 264 Minn. 279, 118 N.W.2d 795 (1962); *Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597 (1975). The mere spectre of increased government liability does not dissuade us from finding a special duty here. Minn. St. 466.04 fixes maximum liability limits for municipalities, including counties. Moreover, our holding does not abrogate traditional limits on tort liability. Second and relatedly, subjecting governmental units to suits of this sort should not significantly impinge on the business of governing. If the decision to abate a known dangerous condition is properly characterized in the circumstances as involving the exercise of discretion, the governmental unit will have a defense to a negligence action. See, footnote 3, *supra.* If abating a known dangerous condition is ministerial, the proper business of government is remedying the hazard and the threat of liability will likely hasten that end. Although the policy grounds of the public duty doctrine are not compelling in this context, they are of sufficient moment to convince us of the general validity of the rule. Government is not intended to be an insurer of all the dangers of modern life, despite its ever-increasing effort to protect its citizens from peril.

In the instant case, applicable PCA regulations contemplate protection against acci-

---

**9.** In this respect, our holding approximates *Hansen v. City of St. Paul,* 298 Minn. 205, 214 N.W.2d 346 (municipal liability for known vi-

cious dogs). See, also, *Gannon Personnel Agency, Inc. v. City of New York,* 55 A.D.2d 548, 390 N.Y.S.2d 62 (1976).

dental fire.[10]  Enactment of Minn. St. 400.-06 (quoted in footnote 1, *supra*) 1 year after issuance of the regulations indicates legislative intent that counties enforce these standards.  Although such regulations in part are for the general public's benefit, they are also designed to protect individuals who live in proximity to solid waste disposal sites.  Since county officials had actual knowledge of the risk of serious harm that foreseeably threatened plaintiffs and were in a position and had the authority to abate the risk, the duty imposed by the statute and regulations was actionable.  We therefore affirm the district court's order and remand for trial.

We counsel against the thought that affirmance is synonymous with liability.  The procedural posture of this appeal—certification of a single issue from an order denying summary judgment—leaves many issues as yet unresolved.

Affirmed.

**10.**  Minn. Reg. SW6 (2) requires in part: "(k) Equipment shall be provided and kept at the site during the hours of operation to control accidental fires and arrangements made with the local fire protection agency to immediately acquire their services when needed.

"(1) Adequate communication facilities shall be provided for emergency purposes."

The following are among the requirements Minn. Reg. SW11 (1) prescribes for the operation of existing disposal sites during the interim planning period to comply with PCA sanitary landfill requirements: "(g) Adequate measures are taken to protect the surrounding area from wind-blown debris, and from the spread of accidental fires from the disposal site.

\*     \*     \*     \*     \*     \*

"(i) Arrangements have been made with a local fire-fighting department to provide for immediate fire-fighting service in case of an emergency."