John ANDRADE, individually and as parent and natural guardian for Joseph J. Andrade, and Dennis W. Aasen, individually and as parent and natural guardian for Jerrett J. Aasen, Appellants,

v.

Elizabeth ELLEFSON, et al., Respondents,

County of Anoka, Respondent.

No. C4–85–554.

Court of Appeals of Minnesota.

Oct. 22, 1985.

Review Granted Dec. 30, 1985.

F. Dean Lawson, John F. Laue, Minneapolis, for appellants.

Graham N. Heikes, St. Paul, Richard A. Beens, Anoka, for Elizabeth Ellefson, et al.

Robert M.A. Johnson, Anoka Co. Atty., Thomas G. Haluska, Asst. Anoka Co. Atty., Anoka, James R. Gowling, St. Paul, for Anoka County.

Heard, considered and decided by POPOVICH, C.J., and FOLEY and LESLIE, JJ.

## OPINION

FOLEY, Judge.

The parents and guardians of two minor children sued Anoka County for negligence in supervising, inspecting and recommending licensing of the day care home where their infants were seriously injured. Appellants also sued the day care operators for their negligent operation, care and control of the facility. The county moved for summary judgment arguing: (1) it is immune from liability under Minn.Stat. § 3.736, subd. 3(j) (1984) when it acts as a state "employee" recommending the state's issuance of licenses; (2) it cannot be found negligent since it owed the infants only a general public duty rather than a special duty; (3) it is immune from liability because the licensing of day care homes is a discretionary act; and (4) the injuries were the result of a superseding cause.

The trial court granted the county's motion for summary judgment based on its ruling that the county acts as an employee of the state when it inspects and recommends licensing of day care facilities and is therefore immune from liability under section 3.736, subd. 3(j). Appellants appealed and Anoka County filed a notice of review. We reverse and remand for trial.

## FACTS

Respondent Anoka County learned in July 1974 that respondent Elizabeth Ellefson was providing day care services without a license in violation of state law. Ms. Ellefson was notified of this violation and proceeded to apply for a day care license. Her initial application was processed and her home was inspected by Terry Nagel, a former case aide with Anoka County Community Health and Social Services.

Nagel learned and recorded in her inspection report that Leslie Ansleigh, a 21-year-old male who was "possibly retarded," lived in the home. Nagel did not interview Ansleigh or run a background or police check on him. At her deposition she stated that Ms. Ellefson had told her that Ansleigh had been in a home for mentally retarded youth. Nagel recommended that the Ellefson home be licensed, and the license was issued allowing for the care of five preschool children.

In December 1975, Nagel conducted the annual relicensing inspection. Nagel recalled that, at that time, there were eight or nine children using the home, not necessarily at the same times of day. The home was relicensed upon Nagel's recommendation and following her inspections, in 1975, 1976, 1977, 1978 and 1979. Ms. Ellefson voluntarily quit day care in April 1979, then sought relicensing again for 1980. Following an inspection visit, at which time Ansleigh was again observed in the home, Nagel recommended relicensing for 1980. Nagel received several complaints from a neighbor of the Ellefsons who observed overcrowding at the Ellefson day care home. Apparently these complaints were not investigated.

The interrogatories indicate that Ansleigh was investigated for child molestation

on at least one occasion. The mothers of two small girls who attended the Ellefson day care home submitted statements to Anoka County authorities in June 1983 regarding the sexual abuse of their daughters by Ansleigh in January 1977. The mothers stated that Ms. Ellefson promised to quit day care and obtain counseling for Ansleigh. The deposition of a psychologist indicates Ansleigh received counseling from October 1978 to January 1979.

Although there is no indication that the county learned of this information before Ms. Ellefson's license was suspended in 1983, the county did conduct a pre-licensing inspection of Ms. Ellefson in 1980 when she began day care again. At this time Ansleigh was not interviewed and no police check was conducted even though he was in the home at the time of the visit. The interrogatories indicate that Deputy Sheriff Roger Foss told appellants that "an employee of Elizabeth Ellefson's day care center had been investigated for child molestation on at least one occasion."

In 1981, James Eyer, a day care licenser for Anoka County, became responsible for inspecting, licensing and supervising the Ellefson day care home. He conducted the annual legally-mandated inspections in 1982 and 1983, recommending the relicensing of the Ellefson home. By apparent oversight, he failed to conduct such an inspection in 1981 but nevertheless recommended relicensing.

Eyer conducted his first licensing inspection of the operation in January 1982. At this unannounced inspection, he found the Ellefson home violating its license because six pre-school children were observed on the main floor of the home, the only floor he checked. He also met Ansleigh, an adult male living in the home whom he learned assisted Ms. Ellefson, at least on a part-time basis, in child care. Eyer did not speak with, investigate or run a police check on Ansleigh despite licensing rules requiring this. The home was recommended for relicensing.

Several complaints, discussed more fully in the analysis, were received by Eyer and his co-worker regarding overcrowding and abuse of children in the Ellefson home. Although Eyer drove by the home once to see if there were many children in the yard, as reported, he did not investigate the other complaints. Instead, he believed the complaints were made by a "troublemaker." His co-worker considered the frequent complaints "far-fetched."

On December 12, 1982, 7-month-old Joseph Andrade sustained serious injuries while at the Ellefson day care home. The interrogatories indicate that the Andrade infant was treated for a convex skull fracture, epilepsy and other injuries. Anoka County child protection worker Barbara Ingrassia investigated the injury. Written materials prepared by her were kept confidential in compliance with Minn.Stat. §§ 626.556 and 13.05, subd. 4 (1984). Records were subsequently destroyed between December 1982 and January 1985 according to Ingrassia, as required by section 626.556, subd. 11.

The Ellefson home was inspected and relicensing recommended by Eyer in January 1983. Solicited recommendations from parents included one favorable report from the mother of Joseph Andrade. She did not mention her child's injuries in her evaluation form.

On May 26, 1983, 7-month-old Jerrett Aasen was seriously injured in the Ellefson day care home. He stopped breathing, was resuscitated by Ms. Ellefson and then taken by ambulance to Unity Hospital. He was later transported to Minneapolis Children's Hospital for further treatment and evaluation. The injuries of the Aasen infant include sustained brain damage, visual loss and spastic quadriparesis, subarachnoid hemmorage, cerebral palsy, plus other possible injuries. The complaint alleges the children suffer from permanent and disabling injuries likely to prevent them from engaging in productive employment.

After Eyer learned from a neighbor about the ambulance appearing at the El-

lefson home to take a baby away, he went to the Ellefsons where he learned:

I am fairly sure that she said that they had fed him and were taking him in for his nap, and enroute he just stopped breathing.

When asked:

Did she tell you, do you remember whether she told you whether she was taking him back to his bed or whether Leslie Ansleigh was taking him back to his bed?

Eyer responded:

I believe she said Leslie was.

Ingrassia stated in her report that one of the doctors she spoke with about the injuries of the 7-month old Aasen infant related to her that: "The reports which he had reviewed from the neurologist and the ophthalmologist indicated some acute and chronic eye ground hemorrhaging which was consistent with hard shaking." The report also revealed evidence of an arm fracture sustained 2–5 weeks earlier.

On June 2, 1983, after learning that the Aasen baby "was worse off than we had thought, and it may not have been just holding his breath, that there was possibly something else involved," Eyer and Ingrassia went to the Ellefson home. They found 13 children present on various floors of the home and two unattended in the yard. All were under the age of 3½ years (6 were under 13 months of age). Leslie Ansleigh was also present. Ingrassia felt compelled to note her observations in her report on the investigation of the abuse of the Aasen baby:

From the outside of the house, it is apparent that all of the windows in the home are not only closed, but sealed with plastic on the outside. The temperature in the home was high, my guess would be at least 80 degrees. The draperies were mostly pulled and the only light on was a plant light in the living room. After the children left, Mrs. Johnson and I toured the premises where we noted

two small bedrooms, probably no larger than $8 \times 10$ feet, each contained four cribs. The lights were out and the draperies were drawn. There was one crib in what is apparently the master bedroom, which is off the living room. There was also a crib in an unfinished attic, as well as the portable type crib which was in the living room.

During both of my visits to the Ellefson home, the first, which was approximately 45 minutes and the second, which was 3 hours, I noted a conspicuous lack of any kind of noise from the children. Most of the children were not visible and were brought out of the "crib rooms" as their parents came for them.

Eyer then recommended the license suspension because:

The problem with the Aasen child, I guess we still were not clear at that point whether she had done something or not, but it was certainly questionable, plus the presence of thirteen children in the home, there was no question about that, plus the fact she had not let me in one day, plus at that point we had learned of some alleged sexual abuse that Leslie [Ansleigh] had perpetrated on a couple of day care children several years before which they had never reported to us.

The guardians and parents of the two injured infants sued the Ellefsons for negligent care and Anoka County for negligence in inspecting, supervising and licensing the Ellefson day care home. Following dismissal of the claim against the county through summary judgment, appellants brought this appeal and Anoka County seeks review of the court's other rulings.

## ISSUES

1. Is Anoka County immune from liability here as a "state employee"?

2. Does Anoka County owe the infants injured in a licensed day care home a special duty of care?

3. Were the injuries a result of a superseding cause?

## ANALYSIS

### 1. State Tort Immunity.

■ Anoka County does not fall within the exclusion granted to "the state and its *employees*" for losses "based on the failure of any person to meet the standards needed for a license * * * issued by the state or its agents." Minn.Stat. § 3.736, subd. 3(j) (1984) (emphasis added). The legislature specifically chose to exclude counties from the definition of state: ·

> "State" includes each of the departments, boards, agencies, commissions and officers in the executive branch of the state of Minnesota and includes but is not limited to the Minnesota Housing Finance Agency, * * *, the University of Minnesota, state universities, community colleges, state hospitals, and state penal institutions. *It does not include a* city, town, *county,* school district, or other local governmental body corporate and politic.

Minn.Stat. § 3.732, subd. 1(1) (1984) (emphasis added).

The legislature directs us to consider "[t]he consequences of a particular interpretation," Minn.Stat. § 645.16(6) (1984), and to avoid "a result that is absurd, impossible of execution, or unreasonable," Minn.Stat. § 645.17(1) (1984). The effect of excluding counties from the definition of state is that counties may not benefit from the partial grant of immunity given to the state under section 3.736. Impliedly, the legislature would not thus intend counties to benefit from the immunity granted state *employees.*

The definitions of "state" and "employee" found in section 3.732 apply only to sections 3.732 and 3.736. *See* Minn.Stat. § 3.732, subd. 1 (1984). The legislature obviously presumed that the political subdivisions of a state might be inferred to be included in the term "state" and therefore excluded these subdivisions, including counties, so that these political subdivisions would not benefit from the limited tort immunity granted the state and its employees.

■ Even a reading of the definition "employee" indicates specifically the types of persons included but does not include a county. A maxim of statutory interpretation, "expressio unius est exclusio alterius," meaning that the expression of one thing is the exclusion of another, seems to apply here.

The trial court held that the county is an "employee" here and thus granted it summary judgment. We find that the county did not meet any criteria which would make it an employee.

The statutes and rules of our state delineate the relationship of the county and state with respect to licensing day care homes. The state has the obligation to inspect homes and determine if licensing requirements are met. Minn.Stat. §§ 245.-783, 245.804 (1984). However, in rules promulgated under Minn.Stat. § 245.802, subd. 1 (1984), the state refers to the local county welfare department as an "agency":

> **Agency.** "Agency," unless qualified, means the local county welfare department; the agency is the duly delegated representative of the commissioner.

Minn.R. 9545.0310, subpart 1 (1983). The rules also state:

> The applicant for a FDC [family day-care home] license shall apply through a duly delegated representative of the commissioner. * * *
>
> Upon receipt of a signed and completed application form, the agency shall evaluate the prospective FDC based upon these rules. A prospective FDC which meets minimum standards shall be recommended to the commissioner for issuance of a FDC license. * * *
>
> A nonrenewable provisional license shall be issued for a period of up to one year

where, in the opinion of the agency or the department, the FDC does not fully comply with licensing standards.

A regular license shall be issued for a period of up to two years where, in the opinion of the agency and the department, the FDC fully complies with licensing standards.

Minn.R. 9545.0320, subparts 3 & 5 (1983).

■ The county acts on behalf of or along side of the state, not solely at its direction according to these rules and the Minnesota Public Welfare Licensing Act (Chapter 245). The state does not oversee how the county chooses to carry out these requirements and obviously cannot fire a county. The county funding for its program is also not directly tied to the carrying out of this function. The funds are allocated by the county out of general state and federal grants for community social service programs. Clearly, the county is not an employee. *See LeGrand Supper Club v. Seline,* 348 N.W.2d 805, 807 (Minn. Ct.App.1984).

■ The state, by rule, has defined the county as an "agency" here. Minn.R. 9545.031, subpart 1. According to Minn. Stat. § 3.736, subd. 8:

**Liability insurance.** A state agency, including any entity defined as a part of the state in section 3.732, subdivision 1, clause (1), may procure insurance against liability of the agency and its employees for damages resulting from the torts of the agency and its employees. *The procurement of this insurance constitutes a waiver of the defense of governmental immunity to the extent of the liability stated in the policy* but has no effect on the liability of the agency and its employees beyond the coverage so provided. (emphasis added)

Anoka County concedes it maintained a general liability insurance policy during the period in which the children's injuries occurred. We hold that Anoka County may not cloak itself with a remnant of immunity by asserting a twisted construction of the State Torts Claim Act.[1]

**2. Special Duty.**

■ Anoka County argues it cannot be held liable for negligently supervising and inspecting the Ellefsons' day care home because it owes no special duty to appellants. The trial court found questions of fact on this issue. We disagree and hold that Anoka County owed appellants a special duty here. A "special duty" is owed to an individual rather than to the public as a whole. A governmental subdivision is liable for negligent inspection only if there is such a special duty. *Hage v. Stade,* 304 N.W.2d 283, 286 (Minn.1981); *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 804 (Minn.1979).

*Cracraft* (a six to three decision) suggests factors *for consideration* in making a determination whether one is immune from liability because it only had a public rather than special duty to the injured party.

At what point, then, does the municipality assume to act for the protection of others as distinguished from acting merely for itself when it inspects the activities of third parties for fire code violations? *There is no bright line.* But, without intending to be exhaustive, *there are at least four factors which should be considered.* First, *actual knowledge of the dangerous condition is a factor which tends to impose a duty of care* on the municipality. Second, reasonable reliance by persons on the municipality's representations and conduct tends to impose a duty of care. Of course, reliance on the inspection in general is not sufficient. Instead, the reasonable reliance must be based on

---

**1.** The trial court properly ruled that Anoka County is not immune from liability under any exception for discretionary acts found in the Municipal Tort Liability Act. Minn.Stat. § 466.-

03, subd. 6 (1984). This Act also contains a waiver of the defense of governmental immunity to the extent of liability stated in a policy of liability insurance. Minn.Stat. § 466.06 (1984).

specific actions or representations which cause the persons to forego other alternatives of protecting themselves. Third, a duty of care may be created by an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole. Finally, the municipality must use due care to avoid increasing the risk of harm.

*Cracraft* at 806–07 (footnotes omitted) (emphasis added).

### A. *Actual Knowledge.*

The Minnesota Supreme Court has stated that a finding of "actual knowledge of a dangerous condition" may be sufficient to find a special duty to an injured party:

> The principle is that *a governmental unit owes a particular individual a duty of care when its officer or agent, in a position and with authority to act, has or should have had knowledge of a condition that violates safety standards prescribed by statute or regulation,* and that presents a risk of serious harm to the individual or his property. When such serious injury is reasonably foreseeable, the governmental unit has a duty to exercise reasonable care for the individual's safety.

*Lorshbough v. Township of Buzzle,* 258 N.W.2d 96, 102 (Minn.1977) (emphasis added).

In *Hage v. Stade,* 304 N.W.2d 283 (Minn. 1981) (a five to four decision), the court found that no governmental unit owed any duty to the parties injured and killed in a hotel fire, noting:

> Thus, *there is no evidence that the state had actual knowledge of any dangerous conditions* which were violations of any fire code and *which would serve to impose a special duty* on the state under the first *Cracraft* factor.

*Id.* at 288 (emphasis added).

The court in *Lorshbough* held that the county owed a duty of care to property owners whose property was damaged as a result of fire because the county's solid waste officer *knew* that the township dump did not comply with pollution control agency regulations and was a potential fire hazard with respect to certain property but did nothing to secure compliance.

In the instant case, applicable PCA regulations contemplate protection against accidental fire. Enactment of Minn.St. 400.06 * * * after issuance of the regulations indicates legislative intent that counties enforce these standards. Although such regulations in part are for the general public's benefit, they are also designed to protect individuals who live in proximity to solid waste disposal sites. *Since county officials had actual knowledge of the risk of serious harm that foreseeably threatened plaintiffs and were in a position and had the authority to abate the risk, the duty imposed by the statute and regulations was actionable.* We therefore * * * remand for trial.

*Lorshbough* at 102–03 (footnotes omitted) (emphasis added).

■ A review of the record clearly shows there is material evidence of Anoka County's actual knowledge of child abuse and neglect at the Ellefson day care home and that it failed to carry out its legal duties (*see* Minn.Stat. §§ 245.783, subd. 3, 245.802, 245.804, 245.805 (1984); Minn.R. 9545.0310 *et seq.* (1983) before recommending the Ellefson home for licensing and relicensing.

A neighbor of the Ellefsons stated at her deposition that she reported to Anoka County licensing workers Sandra English, Terry Nagel and James Eyers by telephone and in person on several occasions over a number of years, that there was overcrowding at the Ellefson day care home and that children were physically abused and often neglected in the back yard. The neighbor specifically told English that Ms. Ellefson had told her that she would flush a child's head in the toilet to stop the child

from crying. The neighbor also told English that she had once observed a small child tied to a hobby horse and left alone in the back yard for several hours.

English admits receiving numerous calls that lasted ten to fifteen minutes from this neighbor:

> There was things like too many children, little children being left out in the yard, something funny going on in the garage. She talked quite a bit about a man who was staying with the Ellefsons that she called their foster child, which is not accurate. * * * She talked about Leslie having to care for the children. Something about a tunnel being built between the garage and the house.

English stated that she relayed written messages of these calls to Eyer, the social worker who was responsible for licensing the Ellefson home. English specifically remembered receiving a telephone call from a neighbor complaining "there were quite a group of small children in Mrs. Ellefson's backyard, that they had been there quite awhile, and it was very hot, and one of the small children was tied to a hobby horse."

English testified that she believed "[t]he accusations were pretty far-fetched." English knew that the neighbor also operated a day care home and she was not aware of any complaints received about the neighbor. The neighbor further testified that many times whoever answered her calls regarding activities at the Ellefson home would hang up on her as soon as he or she recognized her voice.

Nagel does not remember complaints made by the neighbor about overcrowding, although the neighbor stated she told Nagel several times that Ellefson exceeded her license.

Eyer admitted receiving numerous complaints, by phone and in person, from the neighbor regarding the number of children in the Ellefson home, as well as allegations of noncompliance with rules and neglect of children. Eyer licensed both the Ellefson and the neighbor's home. Eyer indicated he failed to take the neighbor seriously most of the time and considered her a troublemaker until her complaints were validated. He took her seriously after the severe injury of the second infant in the home and when his subsequent unannounced inspection revealed 13 preschool children in the home.

Eyer stated that only once, in January 1982, had he dropped in unannounced to inspect the Ellefson home. Otherwise, the annual relicensing inspections were prearranged. Eyer also stated he never checked the upstairs or basement to see if other children were present in the home or to see if restrictions on the use of these areas were followed. The unannounced January 1982 visit revealed six preschool children on the main floor, the only floor inspected. He subsequently recommended relicensing the home.

The facts here differentiate this case from the *Cracraft* and *Hage* cases where only a public duty was found. Here, it is clearly demonstrated that Anoka County had "actual knowledge of the risk of serious harm that foreseeably threatened appellants." *See Lorshbough* at 103. Since the county "had the authority to abate the risk," the "duty imposed" upon the county by the statutes and rules governing day care licensing are actionable in this case. *See id.*

The trial court aptly reviewed the additional three factors suggested for evaluation in the *Cracraft* case and found some evidence on each point. Although our case law does not require a finding on each factor, a discussion of these factors further supports our holding that this case should proceed to trial.

### B. *Reasonable Reliance.*

■ The day care children, whether infants or not, and their parents relied on the county's pre-licensing and relicensing inspections and supervision of only appropri-

ate and qualified homes to protect the day care children from harm while their parents were at work.

Parents seeking child care were referred by the county only to a list of licensed homes. Licensing of day care homes is not mandatory. Minn.Stat. § 245.791 (1984). Parents may select licensed or non-licensed homes. This distinguishes the licensing inspections of the county here from most other general licensing functions of a state or county where all businesses in their class must obtain a license or submit to inspections.

The affidavit of a parent of a child using the Ellefson home for day care stated that he would only place his child in a licensed home. This reflects the fact that licensing standards and rules for licensed day care homes are important to parents selecting day care and that parents rely on the enforcement of licensing rules. The rules governing the type of care to be provided children in licensed day care homes and centers require over 50 pages in volume 6 of Minnesota Rules (1983). These rules discuss the qualifications required for day care providers, the physical environment of the home, the milk and water supply, ventilation, nutrition, daily activities, furniture and space requirements, use of yard and basement, cleanliness, lighting, discipline, sick children, diapering, toileting, etc. Appellants allege that the county violated 12 of these rules by recommending, licensing and relicensing of the Ellefson home.

The trial court noted that parents may have relied on specific rules governing day care which state the required personal qualifications of applicants. For example, Minn.R. § 9545.0340 (1983) prohibits the issuance of a FDC license to a home where any member of the household has any of the following characteristics:

A. a conviction for, admission of, or substantial evidence of an act of child battering or child abuse or child molesting;

B. use of alcohol or drugs such that its effects are apparent during the hours that children are in care;

C. a placement of the family's own children in foster care or residential treatment for emotional disturbance within the previous 12 months unless the primary reason for such placement was * *;

D. a conviction for any felony or offense involving moral turpitude.

*Id.* As the district court noted:

By recommending that the license be issued, the county has represented that no person in the day care household has any of the proscribed characteristics. The plaintiffs may have relied on that representation and refrained from performing their own inspection of the day care center or their own investigation of the persons running the center.

Likewise, parents rely on other licensing prerequisites and thus often limit their own investigations of the home and operator.

### C. *Protected Class.*

Evidence on this factor is very strong here. The 50 pages of rules governing the operation and licensing of day care homes and centers specifically detail how the needs of the children in the home are to be met or not met. The obvious benefactors of day care licensing are the children who use them and, indirectly, their parents.

The general public is not affected by a refusal to license an applicant, only a specifically determinable group of children, limited in number, is the direct benefactor of each issued license. Each licensed day care center may only accept a limited number of children. Each center must maintain records of children enrolled, their health and immunization records. Each center is inspected and a checklist completed prior to initial licensing to ensure the safety of the individual children enrolled there. The parents of enrolled children are contacted when their child appears ill or is injured.

The entire orientation of the rules is the protection of the enrolled children. For

example, there are rules prohibiting corporal or psychological abuse for the stated reason that "[a]lthough families differ in their approach to discipline, harsh or threatening methods are not appropriate for children in day care." Minn.R. § 9545.-0380 (1983). The rules governing the personal qualifications of day care providers state:

> FDC applicants and others living in the household shall be kind and responsible people with a genuine liking for children. They shall possess consistent and healthy methods for handling the life style unique to their own families.
>
> Reason: Children in family day-care programs are under the care of the day care providers for a large portion of the day and therefore are strongly influenced by the emotional climate and the values within that day-care home. Children are often too young or too frightened to speak out against physical or emotional abuse or neglect.

Minn.R. § 9545.0340. Other rules list required daily activities, state that infants must be held during bottle feeding, describe the recommended diet and exercise for children of specific ages, etc. The trial court concluded:

> These detailed rules are clearly intended to protect a special class of people, day-care children, from physical and emotional harm. They are not general safety rules required to protect the general public, but "mandatory acts clearly for the protection of a particular class of persons rather than a public as a whole." *Cracraft* at 807.

Children enrolled in the Ellefson home were a protected class to whom Anoka County owed a duty of reasonable care in their pre-licensing interviews and inspections, relicensing inspections and supervision for rule violations.

### D. *Due Care.*

■ There is evidence that despite the warnings of overcrowding, abuse and neglect at the Ellefson home, even the serious injury of the Andrade infant months before the injury of the Aasen infant, the county failed to exercise reasonable care under the circumstances.

The county officials in charge of licensing the Ellefson home admit to never checking on Ansleigh's background, admit they did not interview him or run a police check on him. English and Nagel explained that licensing rules and procedures require a background check, including an interview and police check, on adults in the home. Further discovery and evidence produced at trial may well produce a causal relationship between the infants' injuries and the conduct of Ansleigh.

The county officials admit relicensing Ellefson in 1981 with no inspection, admit relicensing in 1982 even though she was found to exceed her license that day and even though the neighbor told them she had observed up to 10 children at times that year. They admit to relicensing in 1983 after no apparent investigation of the injuries sustained by the Andrade infant in the home the month before the relicensing inspection. This was done despite the neighbor's phone calls about the child tied to the hobby horse, the child being flushed, and that up to 19 children were seen being picked up in one afternoon from the home. The county also admits relicensing each year without investigating whether Ansleigh was assisting in the day care and was a suitable employee for this job.

County licensing employees explained that they did not take the allegations of the neighbor seriously but considered her a "troublemaker" and believed her accusations were "far-fetched." They even told her she was getting too old for day care. The county admits notice of overcrowding and abuse and neglect of children in the Ellefson home, yet its employees conducted only a prearranged, annual, cursory inspection of the home's main floor.

The uncontroverted evidence here establishes that Anoka County owed the appellants a special duty of care.

### 3. Superseding Cause.

The county argues that it cannot be held liable for the appellants' injuries because those injuries were the result of a superseding cause. We agree with the trial court's ruling on this issue:

Whether the injuries were the result of a superseding cause or the direct result of the County's negligence cannot be determined on a motion for summary judgment. Summary judgment should only be applied where there is clearly no issue of fact. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981). Proximate cause, in this case, is not clear. If the County was aware of the overcrowding and unsafe conditions at the Ellefsons, then the injuries were reasonably foreseeable, and any negligence of the Ellefsons was not superseding. *Kroeger v. Lee*, 270 Minn. 75, 132 N.W.2d 727 (1965). This is a factual issue on which there is room for "honest differences of opinion among reasonable people." *Hamilton v. Independent School Dist. No. 114*, * * * [355 N.W.2d 182, 185 (Minn.Ct.App.1984)]. Summary judgment cannot be granted as to this argument.

### DECISION

1. The trial court erred in granting Anoka County summary judgment on the basis it is immune from liability as a state "employee" under the State Tort Claims Act.

2. Anoka County owes a special duty of care to the appellants.

3. Whether the infants' injuries were the result of a superseding cause should be determined at trial.

We reverse and remand this case for trial on the remaining issues of Anoka County's alleged negligence, including whether it violated its duty and if so, whether the violation was a direct cause of appellants' injuries, and an award of damages, if appropriate. The action against the Ellefsons remains for trial.

Reversed and remanded.

POPOVICH, C.J., dissents.

POPOVICH, Chief Judge (dissenting).

I respectfully dissent and would affirm the trial court:

1. Following *Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 118 N.W.2d 795 (1962), the state legislature enacted the Minnesota Tort Liability Act of 1963 granting municipalities and local agencies, including counties, limited immunity. Minn.Stat. ch. 466. The absolute immunity of the state was limited by passage of Minn.Stat. § 3.736 in 1976. The majority makes much of the exclusion of counties from the definition of "State" in section 3.732, subd. 1(1). The legislative history of both laws indicates the basis for that exclusion since counties were already covered in chapter 466. The discussion of inclusion or exclusion is of no assistance in this matter.

2. The responsibility to inspect homes and license day care homes is a state responsibility, as the majority admit. This state responsibility is delegated to the counties who, when so acting, are doing so as state employees. The majority cites *LeGrand Supper Club* as authority for their position the county is not an employee, but *LeGrand* involved private employers for the limited purpose of state unemployment compensation law. Here the statute indicates the actual relationship.

Under Minn.Stat. §§ 245.783 and 245.801, the ultimate decision to issue, deny, suspend or revoke a license rests with the Department of Public Welfare. However, under Minn.Rule 9545.0310, subpt. 1, the local county welfare department is designated "the duly delegated representative of the commissioner." The rules compel the county welfare department to evaluate the potential operator and recommend licensing if the prospective licensee meets the minimum standards prescribed by the rules. Rule 9545.0320, subpt. 5. Furthermore, the county must make evaluation visits at least once every twelve months. *Id.* subpt. 7. In order to provide these services, the county receives funding from the state and federal governments. All of these factors

tend to show that the relationship between the state and the county was that of an employer and employee.

The district court, viewing the question as a "problem of statutory construction" held the county did act as an employee of the state, therefore it was immune from liability. That court, citing Minn.Stat. § 3.732, subd. 1(2), noted the county was an agent which acted on behalf of the state. The district court, therefore, held the county was an employee of the state. I agree.

3. Neither do I believe the county has a special duty to appellants as it performs the state's licensing duties. The special duty theory stems from *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn. 1979). There, the supreme court held a governmental body is not liable for negligent inspection unless it owes a "special duty" to the injured person rather than a general duty to the public as a whole. The special duty doctrine is essentially a judicial recognition of the modern trend to make government inspections in a vast number of areas. Governmental bodies routinely make general building inspections, fire inspections, and inspections of a wide variety of other establishments. While each of the inspections benefit the individuals who use the particular establishment inspected, the entire regulatory scheme is designed to protect society as a whole. The special duty doctrine recognizes the prevalence of these general regulatory enactments and the immense financial burden which could be imposed on governmental bodies when possibly insolvent or underinsured third parties are negligent and plaintiffs seek a "deep pocket." As the court stated in *Lorshbough v. Township of Buzzle*, 258 N.W.2d 96, 102 (Minn.1977), "Government is not intended to be an insurer of all the dangers of modern life, despite its ever-increasing effort to protect its citizens from peril." Because of this, the Minnesota Supreme Court has held in order for the government to be liable for negligently performing its duties under these general regulatory inspections, the government must have owed the plaintiff a special duty.

In the present case, there is a controversy over whether the county had actual knowledge of the dangerous conditions of the day care center. The statutes and regulations also seem to have been designed to protect day care children as a class. In spite of this, summary judgment should have been granted because it is undisputed that appellants did not reasonably rely on specific representations and conduct of the county nor did the county increase the risk of harm to the children.

Under the second prong of the *Cracraft* test, appellants must show they reasonably relied on specific actions or representations of the county so they failed to take other steps to protect themselves. Although the trial court suggested numerous ways in which appellants may have relied on the county, the only evidence is an affidavit filed by one of the appellants which says he would not have sent his child to the day care center had it not been licensed. This general reliance on the county's inspections and recommendations to license is just not enough to satisfy this requirement. As the *Cracraft* court stated:

> Reliance on the inspection in general is not sufficient. Instead, the reasonable reliance must be based on specific actions or representations which cause the persons to forego other alternatives of protecting themselves.

279 N.W.2d at 807.

Appellants do not assert they relied on any specific statements by county officials that they had inspected and the facilities were safe. Nor do they assert they relied on any specific conduct other than the general inspection and licensing. Because the record contains no evidence to show that appellants relied on any specific actions or representations of the county, the second factor of the *Cracraft* test is clearly not met.

The fourth factor in the *Cracraft* test is also not present in this case. The trial

court felt the county would be liable merely if it did not exercise reasonable care in investigating the day care center. However, under *Cracraft* the test is not whether the county used due care to decrease the risk of harm as the trial court seemed to believe. Under *Cracraft*, appellants must show the county did not "use due care to avoid increasing the risk of harm." *Id.* While the distinction is subtle, the cases have shown that the county is not obligated to decrease the risk of harm, but merely to avoid increasing the risk of harm. In *Hage v. Stade*, 304 N.W.2d 283 (Minn.1981), the court found this fourth factor was not present even though the governmental inspectors failed to decrease the risk of harm. The same is true of the *Cracraft* inspectors who arguably failed to exercise reasonable care in their inspections.

It is clear in this matter the county did nothing to increase the risk of harm to the children. Even assuming the county knew of the dangerous conditions at the day care center, the risk of injuries to the children after the inspections was the same as before the inspections. The situation is similar to *Cracraft*, where the court stated "the risk of explosion prior to the inspection was the same as after the inspection." 279 N.W.2d at 808. Because of this, the fourth part of the *Cracraft* test is also clearly not met.

4. In any event, it is clear the county has procured liability insurance. To the extent it has, immunity is waived to the extent of the coverage defined in the policy, otherwise the premium expenditures would have been a waste of public funds and contrary to public policy. Minn.Stat. §§ 3.736, subd. 8, 466.03, subd. 6 (1984). In my opinion, unlimited liability is not, however, provided. The plaintiffs continue to have a proper private cause of action against the operator and employees of the day care center itself.